IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

IAN CUYPERS,

     Plaintiff,

                                 Case No:  24-CV-743

v.

SUPERIOR POLICE DEPARTMENT
OFFICERS JUSTIN TAYLOR, TAYLOR
GAARD, SGT. MATTHEW BROWN and
CITY OF SUPERIOR,

     Defendants.

---

**DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

---

Defendants Superior Police Department, Officers Justin Taylor, Taylor Gaard, Sergeant Matthew Brown, and the City of Superior, by their attorneys, Crivello, Nichols & Hall, S.C., submit the following brief in support of their motion for summary judgment.

## INTRODUCTION

Plaintiff's claims arise from a brief, recorded, and fully justified high-risk traffic stop that occurred after he drove the wrong way down a one-way street. The undisputed video evidence shows that the Officers acted reasonably at every stage of the encounter: they initiated the stop based on an observed traffic violation; issued multiple clear and repeated commands; attempted to gain Plaintiff's cooperation without force; and used only limited, proportionate measures when Plaintiff refused to comply and repeatedly engaged in movements that raised legitimate officer-safety concerns. Once Plaintiff was secured, the officers immediately de-escalated, offered medical care, discussed alternatives to criminal charges, and ultimately transported him back to his vehicle.

Plaintiff nevertheless brings claims for excessive force, failure to intervene, malicious prosecution, intentional infliction of emotional distress, and indemnification. Each claim fails as a matter of law. The objectively reasonable actions of the Officers—confirmed by body-worn and squad camera footage—do not establish any constitutional violation under the Fourth Amendment. Nor is there any evidence that the Officers acted with malice, pursued a baseless prosecution, intended to cause emotional distress, or engaged in conduct outside the scope of Wisconsin's broad discretionary-immunity protections. Moreover, even if Plaintiff could identify a constitutional violation (he cannot), the Officers are independently entitled to qualified immunity because no clearly established law would have placed them on notice that their actions during this rapidly evolving, high-risk stop were unlawful.

Because the material facts are undisputed and no reasonable jury could find in Plaintiff's favor, Defendants are entitled to judgment as a matter of law on all claims.

**STATEMENT OF FACTS**

This case arises from a lawful traffic stop conducted by Superior Police Department Officers Justin Taylor, Taylor Gaard, and Sergeant Matthew Brown, on February 28, 2024, after Plaintiff Ian Cuypers was observed driving the wrong way down a one-way street. (PFOF # 9,17). The undisputed record—including squad and body camera footage—shows that Cuypers made multiple furtive movements inside his vehicle after stopping, prompting Officer Taylor to request backup out of concern for officer safety. (PFOF # 14-16). The responding officers, all in uniform and equipped with activated body cameras, conducted a high-risk stop. (PFOF # 13, 22, 25). Despite receiving repeated clear and loud commands, Cuypers repeatedly failed to follow directions, including commands to face away from officers, keep his hands on his head, and kneel on his left knee. (PFOF # 36-37, 39-59, 62). When Cuypers continued to disregard instructions, Officer Gaard deployed her taser after warning him that noncompliance would result in its use. (PFOF # 60-61). Cuypers was handcuffed without further use of force, offered medical care on scene, and later cited for obstructing and driving

against traffic. (PFOF # 67-68, 72, 85, 88). The citations were issued pursuant to probable cause based on his noncompliance and admitted traffic violation. The undisputed facts demonstrate that the Officers acted reasonably and within the bounds of the Fourth Amendment at all times, and no constitutional violation occurred.

ARGUMENT

I.    **SUMMARY JUDGMENT IS PROPER IF THERE ARE NO GENUINE ISSUES OF MATERIAL FACT AND DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW.**

Summary judgment is proper if the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, establish that no genuine issue as to any material fact exists and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  The initial burden is on the moving party to demonstrate, with or without supporting affidavits, the absence of a genuine issue of material fact and that judgment as a matter of law should be granted to the movant.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A material fact is one that is outcome-determinative of an issue in the case with substantive law identifying which facts are material.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Once the moving party has met this initial burden, the opposing party must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial.  *Anderson*, 477 U.S. at 248.  The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.  *Id.* at 242.  Similarly, speculation, hearsay, and conclusory allegations will not suffice to defeat summary judgment.  *Gobitz v. Corvilla, Inc.*, 196 F.3d 879, 882 (7th Cir. 1999); *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997); *see also Mills v. First Federal Savings & Loan*, 83 F.3d 833, 840 (7th Cir. 1996).  Further, "[w]hen the non-movant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict."  *Lawrence v. Kenosha County*, 304 F. Supp. 2d

1083, 1087 (E.D. Wis. 2004).

Additionally, "[w]hen video footage firmly settles a factual issue, there is no genuine dispute about it, and [courts] will not indulge stories clearly contradicted by the footage" at summary judgment. *Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018) (citing *Scott v. Harris*, 550 U.S. 372, 378–81 (2007)); *see also Cibulka v. City of Madison*, 448 F. Supp. 3d 1002, 1025 (W.D. Wis. 2020) (declining to credit plaintiff's testimony at summary judgment where video footage clearly contradicted the testimony); *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011) ("[W]e assign greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene.").

Here, the undisputed facts show that Defendants are entitled to judgment as a matter of law on all of Cuyper's claims.

## II.    PLAINTIFF'S EXCESSIVE FORCE CLAIMS FAIL AS A MATTER OF LAW.

A claim that a law enforcement officer used excessive force in the course of a seizure of a citizen who is not in custody is analyzed under the Fourth Amendment's objective "reasonableness" standard. *Plumhoff v. Rickard*, 572 U.S. 765, 774 (2014) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). The extent of the force used must be weighed against the need for administering it. *Tennessee v. Garner*, 471 U.S. 1, 7–8 (1985). In evaluating whether the use of force was reasonable, a court must first consider the nature and quality of the intrusion on the subject's Fourth Amendment rights and then determine whether the circumstances justified the use of force. *Id.* at 9. This standard requires an analysis of whether the officer's actions were objectively reasonable considering the facts and under the circumstances confronting the officer at the time of the incident, without regard to the underlying motive or intent of the officer, and without the benefit of hindsight. *See Brach v. City of Wausau*, 617 F. Supp. 2d 796 (W.D. Wis. 2009).

To that end, "[t]he nature and extent of the force that may be used depends upon the circumstances surrounding the arrest, including 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Stainback v. Dixon*, 569 F.3d 767, 772 (7th Cir. 2009). Courts must consider these factors "as they would have appeared to a reasonable officer at the scene," and, in doing so, "recognize that officers often need to make split-second judgments based on rapidly developing events." *Id.* As the *Graham* Court explained, the reasonableness analysis is one focused on "reasonableness at the moment," such that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers . . . violates the Fourth Amendment." *Graham v. Connor*, 490 U.S. 386, 396-97 (1989) (internal quotations and citations omitted)). Officers are given "considerable leeway" with respect to their assessments as to the appropriate amount of force to use in a particular situation. *Abbott v. Sangamon County, Ill.*, 705 F.3d 706, 724 (7th Cir. 2013).

Courts must allow officers some deference because they are often forced to make "split-second" decisions—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation. *Graham*, 490 U.S. at 395. This reality is reflected in the fact that courts give considerable leeway to law enforcement officers' assessments about the appropriate use of force in dangerous situations. *Baird v. Renbarger*, 576 F.3d 340, 342 (7th Cir. 2009). "[T]he Fourth Amendment does not require omniscience . . . . Officers need not be absolutely sure . . . of the nature of the threat or the suspect's intent to cause them harm – the Constitution does not require that certitude precede the act of self protection." *Anderson v. Russell*, 247 F.3d 125, 132 (4th Cir. 2001) (citations omitted). In such circumstances, officers often lack a judge's luxury of calm, deliberate reflection. *Id.* This is because "[j]udges view facts from afar, long after the gunsmoke cleared, and might take months or longer to decide cases that forced police officers to make split-second decisions in life-or-death situations with limited information." *Id.* "We as judges have

minutes, hours, days, weeks, even months to analyze, scrutinize and ponder whether an officer's actions were 'reasonable,' whereas an officer in the line of duty all too frequently has only that split-second to make the crucial decision." *Ford v. Childers*, 855 F.2d 1271, 1275 (7th Cir. 1988).

As such, judges must be cautious about second-guessing a law enforcement officer's on-the-scene assessment of the danger presented by a particular situation. *Ryburn v. Huff*, 565 U.S. 469, 475-77 (2012). A police officer's use of force is unconstitutional if, "judging from the totality of circumstances at the time of the arrest, the officer used greater force than was reasonably necessary to make the arrest." *Lester v. City of Chicago,* 830 F.2d 706, 713 (7th Cir.1987).

### A. Providing lethal cover during the traffic stop was not excessive force.

The Seventh Circuit has held, on three notable occasions, that "the mere pointing of a handgun at a person, with no physical contact, could potentially rise to the level of an excessive show of force if found to be objectively unreasonable under the circumstances." *Baird v. Renbarger*, 576 F.3d 340 (7th Cir. 2009); *Jacobs v. City of Chicago*, 215 F.3d 758 (7th Cir. 2000); and *McDonald v. Haskins*, 966 F.2d 292 (7th Cir. 1992). To begin, it is undisputed that only Officer Taylor actually pointed his firearm at Cuypers. () Moreover, those three cases are readily distinguishable from the case at hand.

In *McDonald v. Haskins*, the Seventh Circuit found that the defendant officer was not entitled to dismissal on qualified immunity grounds when he "held a gun to the head of McDonald, a 9–year- old child, and threatened to pull the trigger." 966 F.2d at 292. The Seventh Circuit stated that the most salient facts to its analysis ("the very ingredients relevant to an excessive force inquiry") were that:

> [1] McDonald was not under arrest; Haskins did not merely point a gun at McDonald but rather, [2] held a gun to McDonald's head and [3] threatened to pull the trigger; and McDonald was, at the time the incident occurred, [4] only nine years old. Moreover, McDonald, according to the complaint, [5] posed no threat to Haskins, to his fellow officers, [6] or to the general community.

*McDonald*, 966 F.2d at 294. Considering those six factors, it is undisputed that none of the Officers held a gun to Cuypers' head, did not threaten to pull the trigger, and Cuypers was an adult. (PFOF # 26-29, 31). Moreover, when Officer Taylor ordered Cuypers out of the vehicle, he did not know

whether Cuypers posed a threat; while he was only conducting a traffic stop, he saw furtive movements in the vehicle and had no way of knowing how Cuypers would react to police officers stopping the vehicle and ordering him out of the vehicle. (PFOF # 14-15).

In *Jacobs v. City of Chicago*, the defendant police officers obtained a search warrant for a building that was described as a single-family home on the warrant but was in fact a three-unit apartment building. 215 F.3d 758, 763-64 (7th Cir. 2000). Each unit was searched, and the occupant of one of those units brought an excessive force claim after "one of the officers placed a gun to Jacobs' head for over ten minutes during the initial period of the search of his apartment." *Id.* at 773. In finding the officers were not entitled to qualified immunity, the Court found it most relevant that:

> [1] The officer kept the gun pointed at Jacobs for over ten minutes, [2] even after ascertaining that Jacobs was not the person he was looking for, and [3] during which time Jacobs did nothing more threatening than provide the officer with his identification and ask the officer for permission to sit down . . . [and that] at the time the Defendant Officers entered Jacobs' apartment, [4] they do not appear to have had probable cause to suspect Jacobs had committed any crime or to believe that any criminal activity was being conducted in Jacobs' apartment.

*Id.* at 773–74. Again, the case at hand differs from *Jacobs* in several significant respects. Most significantly, there is no evidence Defendants ever placed a gun to Cuypers' head, the encounter was brief, furtive movements had been observed, and the moment Cuypers was secured, Officers holstered their guns. (PFOF # 14, 26-29, 31-32, 67-69).

In *Baird v. Renbarger*, the Seventh Circuit upheld a denial of summary judgment based on qualified immunity after the defendant officer held multiple people at gunpoint with a 9-millimeter submachine gun while investigating the possible alteration of a vehicle identification number. 576 F.3d 340, 342 (7th Cir. 2009). Specifically, while investigating the possible VIN alteration, Renbarger not only detained everyone at the auto body shop but "rounded up anyone in the surrounding shops and warehouse." *Id.* at 343. Applying the *Graham* factors, the Court found it relevant that the suspected crime was "a far cry from crimes that contain the use of force as an element, crimes involving possession of illegal weapons, or drug crimes, all of which are associated with violence." *Id.* at 344. In

addition, the officers had no "reason to suspect that there was any threat to the safety of the officers involved," or indeed that most individuals detained at gunpoint had committed any crime. *Id.*

In the present case, both the nature of the scene and the relationship of Cuypers to a concern for officer safety are vastly different than in *Baird*. While Taylor was initially only investigating a traffic violation, the circumstances changed when Cuypers made furtive movements in the vehicle which caused a concern for the safety of the officers involved, and again when Cuypers repeatedly failed to follow commands which was a violation of Wisconsin Statute §946.41(1), and was within reach of some of the officers as he continued his refusal to follow commands.

Relying on the Seventh Circuit's reasoning in *McDonald*, *Jacobs,* and *Baird,* courts have found that holding a criminal suspect at gunpoint until they have been handcuffed is reasonable as a matter of law. For example, in *Rebolar v. City of Chicago*, a twelve-year-old boy was suspected of breaking into cars during a parade. 897 F.Supp. 2d 723, 729 (N.D. Ill. 2012). Officers held the boy a gunpoint until he was handcuffed. *Id.* at 730. Rebolar brought an excessive force claim against the officers based, in part, on the fact that he was held at gunpoint. *Id.* at 735. The court was easily able to distinguish the cases discussed above to find that the "facts [were] not sufficient as a matter of law to establish that excessive force was used when the plaintiff was detained and taken into custody." *Id.* at 737.

Likewise, in this case, it is undisputed that Officers only had their weapons unholstered until Cuypers was handcuffed. (PFOF # 26-29, 31). In addition, it is undisputed that less than two minutes elapsed between Cuypers exiting the vehicle and being placed in handcuffs. (PFOF # 32). Because the facts here so closely mirror those in *Rebolar*, this Court should also find that the facts "are not sufficient as a matter of law to establish that excessive force was used…" *Id.* at 737.

Even if the Officers use of force in allegedly briefly unholstering their guns was not objectively reasonable as a matter of law, cases like *Rebolar* show that their use of force did not violate clearly established law.

**B. The taser deployment to handcuff Cuypers was objectively reasonable and not excessive force.**

The use of a taser in this case falls squarely within the range of force that the Seventh Circuit has repeatedly found reasonable when a suspect refuses to comply with lawful commands and exhibits behaviors indicating a threat to officer safety. While a taser is "more than a de minimis application of force," the Seventh Circuit recognizes that it occupies a middle position on the non-lethal force continuum, well below baton strikes, beanbag rounds, or other impact weapons. *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 726 (7th Cir. 2013). The constitutional question therefore turns not on the mere fact that a taser was used, but on whether the totality of the circumstances justified that intermediate level of force.

Here, it plainly did. Courts consistently hold that deploying a taser against an actively resisting or potentially assaultive individual is reasonable and does not violate clearly established law. *See Clarett v. Roberts*, 657 F.3d 664, 674–75 (7th Cir. 2011) (upholding multiple taser deployments where defendant used taser three times on plaintiff when she blocked the doorway to her son's bedroom after several officers had entered and defendant heard a commotion in the bedroom and believed officers needed help); *United States v. Norris*, 640 F.3d 295, 303 (7th Cir. 2011) (taser use reasonable where suspect refused commands and his conduct suggested potential violence).

This case is distinguishable from cases like *Cyrus v. Town of Mukwonago*, 624 F.3d 856 (7th Cir. 2010), where the suspect was visibly intoxicated, surrounded by multiple officers, and—most critically—not in close proximity or making movements suggesting an imminent attack. Unlike even the plaintiff in *Cyrus*, Cuypers was not merely noncompliant; he escalated the encounter through repeated furtive movements inside the vehicle, by lowering and moving his hands despite clear commands, by repeatedly engaging in "target glancing"—a recognized pre-assault indicator suggesting that a suspect is looking for an avenue to attack officers while closing distance toward officers. (PFOF # 14-19, 39-46, 49-53, 56, 74-75).

9

The law does not require officers to wait for violence to materialize before acting. As the Fourth Circuit explained in *Anderson v. Russell*, officers "need not be absolutely sure of the nature of the threat" before using force; the Constitution does not require "certitude" before self-protection. 247 F.3d 125, 132 (4th Cir. 2001). What matters is what the officer reasonably perceived at the moment force was used, not the technical severity of the underlying offense. *Id.* The *Anderson* court, held:

> Assuming, however, that the suspected criminal activity at issue was relatively minor, that factor would prove irrelevant to our excessive force analysis because our focus is on the circumstances as they existed at the moment force was used. At the precise moment that Russell used deadly force, he reasonably believed that Anderson posed a deadly threat to himself and others, making the nature of the suspected criminal activity at issue at the time Russell approached Anderson irrelevant.

*Id.* at 132.

At the moment Officer Gaard deployed her taser, she was confronting: a suspect who had made furtive movements in the vehicle; a suspect who had already refused multiple loud, clear commands; a suspect who was moving towards officers after failing to keep his hands on his head and face away from officers; and a suspect exhibiting target-glancing behaviors consistent with imminent assault or flight. (PFOF # 14-19, 39-46, 49-53, 56, 74-75).

Under these rapidly evolving circumstances, Officer Gaard was not required to assume Cuypers was harmless or to risk allowing him to access a weapon or overpower the officers in close quarters. Her controlled taser deployment—an intermediate tactic intended to prevent escalation and enable safe handcuffing—was precisely the type of measured response the Seventh Circuit has consistently upheld. Once Cuypers was handcuffed, no further force was used. (PFOF # 67-69).

No reasonable jury could conclude that Officer Gaard's use of force was objectively unreasonable. The undisputed facts demonstrate that the taser deployment was a proportionate, constitutionally permissible response to Cuypers' noncompliance and the immediate threat indicators he presented.

### III.  PLAINTIFF'S FAILURE TO INTERVENE CLAIM FAILS AS A MATTER OF LAW.

Under certain limited circumstances, an officer's failure to intervene renders the officer culpable under § 1983. *See Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). To establish liability for failure to intervene against any of the other officers present, Plaintiff must show that each had reason to know: "(1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; *and* the officer had a realistic opportunity to intervene to prevent the harm from occurring." *Id.* (italics in original), citing *Anderson v. Branen*, 17 F.3d 552, 556 (2nd Cir. 1994). The court has further explained that "[a] 'realistic opportunity' means a chance to warn the officer using excessive force to stop." *See Miller v. Gonzalez*, 761 F.3d 822, 826 (7th Cir. 2014). Even if Plaintiff could establish use of the taser was excessive force, given the facts established in discovery, Plaintiff certainly cannot establish the elements of this claim against Officers Taylor and Brown who were present.

First, because the force used was reasonable on the undisputed facts, the derivative failure-to-intervene claim fails as a matter of law. *See Abdullahi v. City of Madison,* 423 F.3d 763, 767–68 (7th Cir.2005) ( "Though legally distinct, the fact of plaintiff's failure to intervene claim is closely linked to that of her excessive force claim since, by definition, if there was no excessive force then there can be no failure to intervene.").

Furthermore, to the extent Cuypers seeks to hold Officers Taylor, Brown, and Gaard liable for failing to intervene in preventing each other from having guns drawn (dkt. 7, ¶ 59), the claim would fail because an officer "cannot intervene in his own constitutional violation." *Flint v. City of Milwaukee*, 91 F. Supp. 3d 1032, 1063 (E.D. Wis. 2015). Assuming that each was personally involved, they could not be liable for failing to intervene in their own conduct—that is not logical. It is also illogical why Plaintiff is pursuing such a claim, as a plaintiff cannot recover twice for the same injuries, *see Duran v.*

*Town of Cicero*, 653 F.3d 632, 642 (7th Cir. 2011), and so if the jury finds for Cuypers, the failure-to-intervene claim would be redundant.

Regarding Officer Gaard's use of the taser, the events unfolded within seconds following a verbal warning, during a dynamic high-risk stop leaving no realistic opportunity to intercede. (PFOF # 60-61, 63). Cuypers can produce no evidence that any force used by Officer Gaard was repeated or sustained long enough that Officers Taylor and Brown had a "realistic opportunity" to intervene. (PFOF # 60-61, 63, 66). Officer Taylor was on the opposite side of the vehicle and neither Officer could predict if Officer Gaard would actually deploy the taser or if Cuypers would follow the command based on the warning. (PFOF # 65). No reasonable jury could find that Officers Taylor and Brown could have stopped such a quick action.

Therefore, regardless of whether the court grants summary judgment to on the claim of excessive force, Officers Taylor, Brown, and Gaard are entitled to summary judgment on the failure to intervene claims. There is no evidence to support the claim that any officer had a realistic opportunity to intervene to prevent any alleged excessive force.

## IV. THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY.

In this case, Defendants are entitled to qualified immunity under 42 U.S.C. § 1983 unless the unlawfulness of their conduct was "clearly established at the time." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). Cuypers cannot meet this exacting standard regarding the Defendants' use of force or the failure to intervene.

"Public officials are immune from suit under 42 U.S.C. § 1983 unless they have 'violated a statutory or constitutional right that was clearly established at the time of the challenged conduct.'" *City and County of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 778-79 (2014)). A prior case exactly on point is not necessarily required. *See, e.g.*, *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). However, "[a]n officer 'cannot be said to have violated a clearly

established right unless the right's contours were sufficiently definite that any reasonable official in [his or her] shoes would have understood that he [or she] was violating it.'" *Sheehan*, 135 S.Ct. at 1774 (quoting *Ashcroft*, 563 U.S. at 739-40). In other words, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft*, 563 U.S. at 741 (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (emphasis added). "This exacting standard 'gives government officials breathing room to make reasonable but mistaken judgments' by 'protect[ing] all but the plainly incompetent or those who knowingly violate the law.'" *Sheehan*, 135 S.Ct. at 1774 (quoting *Ashcroft*, 563 U.S. at 743).

For Cuypers to defeat qualified immunity, he must show "(1) conduct violating [their] constitutional or statutory rights that is (2) clearly established at the time of the violation such that a reasonable official would understand that what he is doing violates that right." *Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013). The Court has the discretion to decide which prong to address first, but, "[i]f the answer to either question is no, [Defendants are] entitled to summary judgment." *Thompson v. Cope*, 900 F.3d 414, 420 (7th Cir. 2018).  Even if the individual Officers are found to have violated one of Cuypers' constitutional rights, they are still shielded from liability "if the right was not clearly established at the time of the violation." *Findlay*, 722 F.3d at 899.

Cuypers bears the burden of establishing the existence of a clearly established constitutional right. *Burritt v. Ditlefsen*, 807 F.3d 239, 249 (7th Cir. 2015); *Clash v. Beatty*, 77 F.3d 1045, 1047 (7th Cir. 1996). To meet this burden, Cuypers does not need to "point to an identical case finding the alleged violation unlawful, but existing precedent must have placed the statutory or constitutional question beyond debate." *Kemp v. Liebel*, 877 F.3d 346, 351 (quoting *Wilson v. Layne*, 526 U.S. 603, 615 (1999)); *Weiland v. Loomis*, 938 F.3d 917, 919 (7th Cir. 2019) ("Over and over, the Supreme Court has held that a right is 'clearly established' only if it has been 'defined with specificity.'"). "When reasonable minds could differ, in the typical summary judgment decision the balance tips in favor of the nonmovant

while in the qualified immunity context the balance favors the movant." *Ellis v. Wynalda*, 999 F.2d 243, 246 n.2 (7th Cir. 1993).

In *Sheehan*, the Supreme Court criticized the Ninth Circuit for misreading prior Supreme Court precedent regarding qualified immunity. Specifically, the Court criticized the Ninth Circuit for defining the right in question—there, the Fourth Amendment right to be free from unreasonable searches and seizures—at too high a level of generality:

> [N]othing in our cases suggests the constitutional rule applied by the Ninth Circuit. The Ninth Circuit focused on *Graham v. Conner*, but *Graham* holds only that the "objective reasonableness" test applies to excessive-force claims under the Fourth Amendment. That is far too general a proposition to control this case. "We have repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality." Qualified immunity is no immunity at all if "clearly established" law can simply be defined as the right to be free from unreasonable searches and seizures.

135 S.Ct. at 1775-76 (internal citations omitted). The Supreme Court repeated this admonition to lower courts again in 2015. *See Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015) (per curiam) ("We have repeatedly told courts . . . not to define clearly established law at a high level of generality."). As the Court framed the issue in *Mullenix*:

> The dispositive question is whether the violative nature of particular conduct is clearly established. This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition.

136 S.Ct. at 308 (internal quotations and citations omitted) (emphasis in original).

In a recent decision, the Supreme Court of the United States revisited the qualified immunity analysis, rejecting the Fifth Circuit "moment-of-threat rule" which directed a court to look only to the circumstances existing at the precise time an officer perceived the threat inducing him to use force. *Barnes v. Felix*, 605 U.S. ----, 145 S.Ct. 1353 (2025). The Court rejected the approach as improperly narrowing the requisite Fourth Amendment analysis which is to consider *all* of the relevant circumstances, including facts and events leading up to the climactic moment. *Barnes*, 145 S.Ct. at

1356. The Court further explained that the "totality of the circumstances" inquiry into a use of force has no time limit because

> [p]rior events may show, for example, why a reasonable officer would have perceived otherwise ambiguous conduct of a suspect as threatening. Or instead they may show why such an officer would have perceived the same conduct as innocuous. The history of the interaction, as well as other past circumstances known to the officer, thus may inform the reasonableness of the use of force.

*Id.* at 1358. The Court concluded that a court cannot "narrow" the totality of the circumstances inquiry, to focus on only a single moment. *Id.* at 1360. Rather, it must look too at any relevant events coming before. *Id.*

Here, qualified immunity shields the individual Defendants from liability on all claims. The inquiry stops at the first prong of the analysis for all of the reasons discussed in detail above. No jury could find that Cuypers' constitutional rights were violated by the Defendants.

Nevertheless, even if Cuypers could establish that there was some violation of his constitutional rights, these rights were not clearly established at the time of the alleged conduct. Without resorting to hindsight, no reasonable official in the Defendants' position would believe that their actions would violate Cuypers constitutional rights.

### A. Defendants are entitled to Qualified Immunity for drawing their firearms.

Even if Defendants used excessive force in pointing their guns towards Cuypers, they would be entitled to qualified immunity. *Baird, Jacobs*, and *McDonald*, where the Seventh Circuit held that pointing a gun at an individual that presents no danger is unreasonable, "all present extreme situations in which the officers in question obviously overstepped the bounds of reasonableness." *Anderson v. City of West Bend Police Dep't*, 774 F.Supp.2d 925, 950 (E.D.Wis.2011). Here the circumstances simply do not rise to the egregious level of force used in *Baird, Jacobs*, and *McDonald. Id.* at 950–51 (*citing Baird*, 576 F.3d at 345–47; *Jacobs*, 215 F.3d at 773–74; *McDonald*, 966 F.2d at 294–95).

Specifically, "the cases in which the Seventh Circuit has found the display of a weapon to be unreasonable typically involved verbal threats or shocking use of the weapon." *Id.* at 951. In the instant case, the officers did not verbally threaten Cuypers or hold a gun to his head—in fact Cuypers did not even know they had their firearms unholstered. (PFOF # 26-31). Based on this record, the Officers' use of their weapons was "neither patently violative of [Cuypers'] Fourth Amendment right nor contrary to clearly established law," *Anderson*, 774 F.Supp.2d at 951, entitling the Defendants to the protection of qualified immunity as a matter of law on Cuypers' claims of excessive force arising from the unholstering of their guns. Summary judgment on this particular claim must be granted accordingly.

### B. No clearly established law placed Officer Gaard on notice that deploying a taser under these circumstances was unlawful.

Far from "clearly establishing" that a taser deployment is unconstitutional in these circumstances, as discussed above, Seventh Circuit decisions repeatedly hold that using a taser on a resisting or potentially assaultive suspect is permissible. *See Clarett v. Roberts*, 657 F.3d 664, 674–75 (7th Cir. 2011); *United States v. Norris*, 640 F.3d 295, 303 (7th Cir. 2011). The Seventh Circuit has never found a constitutional violation—much less a clearly established one—based on a taser deployment against a suspect who is ignoring commands, closing distance, making furtive movements, or engaging in pre-assault indicators such as target glancing.

The only case Cuypers is likely to invoke, *Cyrus v. Town of Mukwonago*, 624 F.3d 856 (7th Cir. 2010), does not clearly establish anything that would have informed Officer Gaard that her conduct was unlawful. In *Cyrus*, the court concluded that genuine factual disputes precluded summary judgment, but it did not hold that taser use in analogous circumstances is unconstitutional. More importantly, the factual context of *Cyrus* is materially different: *Cyrus* involved a visibly impaired individual, surrounded by multiple officers, who was not closing distance, making threatening movements, or reaching into concealed areas.

Based on the circumstances confronting, Officer Gaard no case clearly establishes that deploying a taser to safely handcuff such a suspect is unconstitutional. If anything, the existing caselaw would lead a reasonable officer to believe the opposite—that an intermediate level of force was permitted and appropriate.

## V.   EVEN IF ONE OR MORE CLAIMS SURVIVE SUMMARY JUDGMENT, PLAINTIFF'S PUNITIVE DAMAGES CLAIM FAILS AS A MATTER OF LAW.

Punitive damages are only recoverable in Section 1983 actions where the defendant had a reckless or callous disregard to the federally protected rights of others. *Smith v. Wade*, 461 U.S. 30, 35, 51 (1983); *Woodward v. Correctional Medical Services of Illinois, Inc.*, 368 F.3d 917, 930 (7th Cir.2004). The Seventh Circuit has interpreted the standard jury instruction for Section 1983 punitive damages as placing the defendant's conduct into one of two categories: (1) "the defendant actually derives satisfaction from hurting the plaintiff"; and (2) "the defendant, while not having any particular desire to hurt the plaintiff, tramples on the plaintiff's rights, in a fashion that can fairly be called reckless, to accomplish his own aims." *Soderbeck v. Burnett County, Wis.*, 752 F.2d 285, 289–90 (7th Cir. 1985). In *Soderbeck*, the court went on to illustrate the two categories as follows:

> If a man sets fire to a house intending to kill the occupants, he is a deliberate murderer; if he sets fire to a house he knows to be occupied, but does so to warm himself rather than to kill the occupants, he is a reckless murderer. But he is a murderer in either case, and would be subject to punitive damages in a suit for wrongful death.

*Id.*

Here, Cuypers cannot show that any of the defendants were "motivated by evil motive or intent" or that they acted with "reckless or callous indifference to [Cuypers'] federally protected rights." *Smith*, 461 U.S. at 56. Prior to the traffic stop, none of the officers knew Cuypers. (PFOF # 13, 23). The various squad and body camera footage shows the officers speaking to Cuypers, attempting to get him to follow commands so they could determine if he presented any danger to them based on his conduct during the traffic stop. (PFOF # 13-19, 33-60). In fact, the undisputed

17

facts show that Sergeant Brown even attempted to take over commands to try to personally gain compliance from Cuypers, which failed. (PFOF # 54). Moreover, nothing in any of the body camera footage comes close to resembling a reckless or callous mindset or attitude toward Cuypers, let alone evil motive or intent. Rather, once Cuypers was secured in handcuffs the Officers spoke calmly to him, offered him medical care, secured his vehicle and recovered personal belongings from the vehicle before transporting him to the jail, discussed alternatives to criminal charges, and upon release drove him back to his vehicle. (PFOF # 68-70, 72-73, 80-83).

Accordingly, Cuypers' claim for punitive damages finds no support whatsoever in the record, and that claim should not go to the jury even in the event that Cuypers' underlying claims survive summary judgment. Defendants are entitled to judgment as a matter of law on Cuypers' punitive damages claim.

## VI.    PLAINTIFF'S MALICIOUS PROSECUTION (STATE LAW) FAILS AND SHOULD BE DISMISSED.

For Cuypers to prevail on a claim for malicious prosecution he must satisfy the following six factors: (1) show a prior institution of a judicial proceeding against him; (2) show that such former proceedings must have been put in motion by or at the instance of the defendant in the malicious prosecution action; (3) show that the proceedings were terminated in favor of the claimant in the criminal proceedings; (4) show malice in instituting the former proceedings; (5) show a want of probable cause for instituting the former proceedings; and (6) show causal damage. *Elmer v. Chicago N.W. Ry.*, 257 Wis. 228, 231, 43 N.W.2d 244 (1950).

These elements apply to the unjustifiable institution of civil judicial proceedings as well as to the institution of criminal proceedings. " *Maniaci v. Marquette University*, 50 Wis.2d 287, 298–98, 298 N.W.2d 168 (1971). All six elements must be present in order to state a valid claim for malicious prosecution, and the absence of any one element is fatal to the claim. *Yelk v. Seefeldt*, 35 Wis.2d 271,

277, 151 N.W.2d 4 (1967). Thus, if the Court finds one element lacking it does not need to examine the other elements.

Cuypers' malicious prosecution claims fail as a matter of law because he cannot satisfy all the requisite *Elmer* factors. First and foremost, Cuypers cannot show a want of probable cause for issuing the citations. In the context of a malicious prosecution action, the existence of probable cause is to be determined by the facts and circumstances surrounding the commencement and continuation of the legal proceedings. *Cordes v. Outdoor Living Center, Inc.,* 301 Ark. 26, 781 S.W.2d 31 (1989). Probable cause for prosecution must be based upon the existence of facts or credible information that would induce a person of ordinary caution to believe the accused person to be guilty of the crime for which he is charged. *Id.*; *see also Wal–Mart Stores, Inc. v. Binns*, 341 Ark. 157, 15 S.W.3d 320 (2000).

Plaintiff's malicious prosecution claim alleges initiation and continuation of a prosecution without probable cause, but the undisputed record shows issuance of an ordinance citation by Officer Taylor for obstructing based on noncompliance with commands during a lawful stop, supported by narrative that Plaintiff did not follow officer commands and made motions contrary to officer commands. To begin, only Officer Taylor could be said to have had any personal involvement in issuing the citations. (PFOF # 77-78, 82-83, 85, 88).

Further, Cuypers was cited for violating City of Superior Ordinance Sec. 102-1. - Refusing to aid police officers; resisting or obstructing officers which provides:

> Whoever fails or refuses to act as required by Wis. Stats. §§ 946.40 and 946.41 and any amendments thereto and whoever commits an act in violation of Wis. Stats. §§ 946.40 and 946.41 and any amendments thereto shall be guilty of an offense under this section.

Obstructing an officer, as defined in Wisconsin Statute § 946.41 requires proof of four elements:

> (1) the defendant obstructed an officer; (2) the officer was doing an act in an official capacity; (3) the officer was acting with lawful authority; and (4) the defendant knew that the officer was an officer acting in an official capacity and with lawful authority and that the defendant knew his conduct would obstruct the officer.

19

*See* Wis. JI-Criminal 1766. To obstruct means that the conduct of the defendant prevents or make more difficult the performance of the officer's duties. Wis. JI-Criminal 1766. The obstructing statute furthers the legitimate interests of the state in protecting peace officers, in preventing frustration of the valid enforcement of the law, in promoting the orderly and peaceful resolution of disputes, and in detecting and preventing crime. *State v. Hamilton*, 120 Wis. 2d 532, 535, 356 N.W.2d 169, 171 (1984)

Here Cuypers knew he was being stopped by law enforcement for a traffic violation, he heard the officers' commands, and he did not comply with all of the commands. (PFOF # 10, 36-62). That is enough to provide probable cause that Cuypers violated Wis. Stat. § 946.41(1). District Courts have concluded that disobeying an officer's order violates § 946.41. *See United States v. Bogan*, No. 17-cr-128, 2017 WL 9485688, at *2 (E.D. Wis. Sept. 26, 2017) (failure to comply with lawful order provided probable cause for § 946.41 violation); *Prip v. Erwin*, No. 14-cv-552-wmc, 2015 WL 4394526, at *5 (W.D. Wis. July 16, 2015) (same). That is enough at least for arguable probable cause. *Pullen v. House*, 88 F.Supp.3d 927, 941–42 (W.D. Wis. 2015) (refusal to obey lawful provides arguable probable cause); *Stabenow v. City of Eau Claire*, 546 F. Supp. 3d 787, 800–01 (W.D. Wis. 2021) (same); *Harris v. City of La Crosse*, 745 F. Supp. 3d 733, 751 (W.D. Wis. 2024). Based on the facts and circumstances of this incident there was probable cause for the citation.

Another factor that Cuypers cannot satisfy is the requirement that any of the Officers acted with malice in issuing the citation. Notably, "where the only evidence of a want of probable cause is the inference that may be drawn from the voluntary dismissal of the original action, such an inference will not support the second inference, that the defendant acted with improper motives. There must be some other direct or circumstantial evidence to support the inference of malice." *Yelk v. Seefeldt*, 35 Wis. 2d 271, 281, 151 N.W.2d 4, 9 (1967). As such, the later acquittal does not itself establish lack of probable cause.

Prior to this event, the Officers had never even had contact with Cuypers (PFOF # 13, 23) and Cuypers has no evidence that any Officer acted with malice. In fact, the record shows the opposite, in Sergeant Brown suggesting Officer Taylor consider issuing an ordinance citation rather than a criminal charge, and Officer Taylor ultimately deciding that to be an appropriate resolution. (PFOF # 80-83).

## VII.    PLAINTIFF'S INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM (STATE LAW) FAILS AND SHOULD BE DISMISSED.

Cuypers' theory is predicated on the malicious prosecution claim and the traffic-stop use of force. To state a claim for intentional infliction of emotional distress under Wisconsin law, a plaintiff must allege that: (1) the defendant's conduct was intended to cause emotional distress; (2) the defendant's conduct was "extreme and outrageous"; (3) the defendant's conduct was a cause-in-fact of the plaintiff's emotional distress; and (4) the plaintiff suffered an extreme disabling emotional response to the defendant's conduct. *See Rabideau v. City of Racine*, 2001 WI 57, ¶ 33, 243 Wis.2d 486, 627 N.W.2d 795.

Cuypers must establish that the purpose of the conduct was to cause emotional distress. There must be something more than a showing that the defendant intentionally engaged in the conduct that gave rise to emotional distress in the plaintiff; and the plaintiff must show that the conduct was engaged in for the purpose of causing emotional distress. Intent may be evidenced by inferences from words, conduct, or the circumstances in which events occurred. *Id.*

As discussed above, the Officers' decisions were within their professional discretion. None of these decisions were motivated by malicious intent. Cuypers can offer no evidence to support an inference that the Officers acted with any intent to cause emotional distress, nor can he explain how these actions constituted "extreme and outrageous conduct" or resulted in an extreme disabling

21

condition. Moreover, the irrefutable video evidence of the Officers' interactions with Cuypers shows

anything but "extreme and outrageous conduct" by the Officers. (PFOF # 68-70, 72-73, 80-84).

## VIII.  DISCRETIONARY IMMUNITY PROTECTS DEFENDANTS AGAINST PLAINTIFF'S STATE LAW CLAIMS.

Governmental immunity under Wisconsin law is "extremely broad." *Estate of Perry v. Wenzel*,

872 F.3d 439, 463 (7th Cir. 2017). Such immunity is committed to the Wisconsin statutes as follows:

> No suit may be brought against any volunteer fire company organized under ch. 213, political corporation, governmental subdivision or any agency thereof for the intentional torts of its officers, officials, agents or employees nor may any suit be brought against such corporation, subdivision or agency or volunteer fire company or against its officers, officials, agents or employees for acts done in the exercise of legislative, quasi-legislative, judicial or quasi-judicial functions.

Wis. Stat. § 893.80(4).

Wisconsin's governmental immunity broadly "provides that state officers and employees are

immune from personal liability for injuries resulting from acts performed within the scope of their

official duties." *Pries v. McMillon,* 326 Wis. 2d 37, 784 N.W.2d 648, 654 (2010). Wisconsin courts have

interpreted this protection as extending to all conduct involving "the exercise of discretion and

judgment." *Milwaukee Metro Sewerage Dist. v. City of Milwaukee*, 277 Wis. 2d 635, 672, (2005). "There are

four exceptions to this broad doctrine: (1) the performance of ministerial duties; (2) the performance

of duties with respect to a 'known danger;' (3) actions involving medical discretion; and (4) actions

that are 'malicious, willful, and intentional.'" *Perry*, 872 F.3d at 462. None of the exceptions apply.

Otherwise stated, there is no substantive liability for damages resulting from mistakes in

judgment where the officer is specifically empowered to exercise such judgment. *Lister v. Bd. of Regents

of Univ. Wisconsin Sys.,* 72 Wis. 2d 282, 301–02, 240 N.W.2d 610, 622 (1976). As articulated in *Lister:*

> It must be conceded that an officer charged with the administration and application of the standards set forth in sec. 36.16, Stat sec. 36.16, Stats., could make mistakes in judgment which would result in an erroneous classification. However, at least in the absence of some malicious, willful and intentional misconduct, the policy considerations underlying the immunity principle require that the officer be free from the threat of personal liability for

22

damages resulting from mistakes of judgment.

*Id.*

Within the realm of law enforcement, multiple cases from Wisconsin and federal courts have held that Wisconsin's "discretionary immunity" applies to the decisions of police officers related to whether and how to arrest. *See Sheridan v. City of Janesville*, 164 Wis. 2d 420, 427–28, 474 N.W.2d 799, 802 (Ct. App. 1991); *Estate of Phillips v. City of Milwaukee*, E.D.Wis.1996, 928 F.Supp. 817. Officers "must continuously use their discretion to set priorities and decide how best to handle specific incidents. Police officers must be free to perform their responsibilities, using their experience, training, and good judgment, without also fearing that they or their employer could be held liable for damages from their allegedly negligent discretionary decisions." *Barillari v. City of Milwaukee*, 194 Wis. 2d 247, 261–62 (1995). With this understanding, discretionary immunity certainly applies to a decision on how to conduct a traffic stop and whether to issue a municipal citation following an arrest.

Moreover, in *Bromund v. Holt*, 24 Wis.2d 336, 129 N.W.2d 149 (1964), the plaintiff brought an action in negligence against a doctor, in his private capacity, for careless performance of an autopsy commissioned by law enforcement officers in the course of their investigation into the death of the plaintiff's wife. *Id.* at 150–51. The plaintiff asserted that the doctor's negligent performance of the autopsy and subsequent proffer of a flawed cause-of-death opinion led directly to the plaintiff's arrest, prosecution, and resulting damages. *See id.* at 150. The court framed the question presented by the plaintiff's suit as whether, assuming that negligence and causation were present, the plaintiff's interest in "freedom from unjustifiable criminal litigation" is the "type of interest [that] is protected against unintentional invasion." *Id.* at 151.

The court then undertook a public policy analysis to determine whether imposing liability on the doctor would be appropriate. It began by noting that "[t]he law, for reasons of policy, closely circumscribes the types of causes of action which may arise against those who participate in law

23

enforcement activity or in the functioning of the judicial system." *Id.* at 152. It went on to observe that, in civil litigation, such defendants often have a relationship to the judicial process that affords them immunity from private liability. *See id.* (citing the protections afforded to, inter alios, prosecutors and witnesses). It next determined that, even when a defendant's relationship to the judicial process does not afford a specific immunity, "he is still not held liable to the person who has been subjected to unjustifiable prosecution in the absence of malice." *Id.* at 153.

The court's reasoning is instructive. In its view, law enforcement and the safeguarding of society from crime would suffer if government agents were subject to private liability for damages arising from simple negligence in the performance of their duties. *See id.* at 153–54. The *Bromund* court held that:

> even if a person employed by the public to assist in law enforcement ... does not enjoy immunity, ... the same considerations of public policy which require proof of malice as an element of an action for malicious prosecution or defamation under these circumstances must exclude liability founded upon mere negligence. In our opinion, the interest in freedom from unjustifiable criminal litigation is, as a matter of policy, not protected from unintentional tort.

*Id.* at 154.

This holding has particular pertinence for present purposes. *Bromund* makes clear that immunity does apply to simple negligence in the performance of duties that leads directly to a plaintiff's arrest, prosecution, and damages. *Id.*

For all these reasons, Cuypers' state law claims fail as a matter of law.

## IX.    PLAINTIFF'S INDEMNIFICATION CLAIM AGAINST THE CITY OF SUPERIOR FAILS AND SHOULD BE DISMISSED.

Cuypers alleges a claim for indemnification against the City of Superior because it allegedly is liable to indemnify all judgments against their respective employees. (Dkt. 7, ¶¶ 77-78) Any such claim is premature, as no judgment has been entered against individual defendants. *See* Wis. Stat. § 895.46. Moreover, because the individual defendants should be dismissed on the merits of Plaintiff's claims

24

and on the grounds of qualified immunity, there is no substantive basis for a claim of indemnification against the City of Superior.

## CONCLUSION

For the reasons stated above, Defendants respectfully request the Court dismiss all of Plaintiff's claims against them, with prejudice and with such costs and disbursements as the Court deems equitable.

Dated this 14th day of November, 2025.

CRIVELLO, NICHOLS & HALL, S.C.
Attorneys for Defendants Superior Police
Department Officers Justin Taylor, Taylor Gaard,
Sgt. Matthew Brown and City of Superior

By:  *Electronically signed by Kiley B. Zellner*
SAMUEL C. HALL, JR.
State Bar No.: 1045476
KILEY B. ZELLNER
State Bar No,: 1056806
MAXWELL P. CONGDON
State Bar No. 1139726
710 N. Plankinton Ave., Suite 500
Milwaukee, WI 53203
Phone: 414-271-7722
Email: shall@crivellocarlson.com
kzellner@crivellolaw.com
mcongdon@crivellolaw.com

25