| | | |
|---|---|---|
| IAN CUYPERS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 24-cv-743 |
| | ) | |
| v. | ) | |
| | ) | Judge James D. Peterson |
| SUPERIOR POLICE DEPARTMENT | ) | Magistrate Judge Anita Marie Boor |
| OFFICER JUSTIN TAYLOR, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Plaintiff Ian Cuypers was pulled over by Defendant Superior police officer Justin Taylor

for accidentally turning the wrong way onto a one-way street while he was making a delivery as

a DoorDash driver. During the traffic stop, Defendant Taylor Gaard tased Plaintiff while he was

unarmed, non-threatening, and suspected only of making a wrong turn. Defendants Gaard and

Taylor also pointed their firearms at Plaintiff without reasonable justification, causing him terror

that he would be killed. Defendants issued Plaintiff an ordinance violation for resisting or

obstructing in an attempt to cover up their misconduct and caused him to be prosecuted and

undergo a trial at which he was ultimately acquitted.

As set forth in Plaintiff's motion for partial summary judgment, dkt. 39, Plaintiff is

entitled to summary judgment on his excessive force claim related to Defendant Gaard's use of

the Taser because Plaintiff was not actively resisting arrest, and under clearly established

Seventh Circuit law, an officer who uses a Taser on a misdemeanant who is not actively resisting

arrest violates the Fourth Amendment. *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 730 (7th

Cir. 2013). In moving for summary judgment on that claim, Defendants ignore the binding case

1

law that conclusively establishes that Defendant Gaard's actions were unconstitutional. They also fail to adhere to the most basic tenets of a summary judgment motion by improperly seeking to cast the record in the light most favorable to them. With the record properly viewed in the light most favorable to Plaintiff, as is required on Defendants' motion, the facts are that Defendant Gaard, during a routine traffic stop, used a Taser on a DoorDash driver who was not resisting arrest and posed no threat to the officers. Defendant Gaard is not entitled to summary judgment for such conduct. In addition, there are material disputes of fact that preclude summary judgment for Defendants on Plaintiff's claims for excessive force based on the pointing of guns, malicious prosecution, failure to intervene, and intentional infliction of emotional distress. Accordingly, Defendants' motion for summary judgment should be denied in its entirety.

## FACTUAL BACKGROUND

On February 28, 2024 around 10:16 PM, Plaintiff Ian Cuypers was delivering food for DoorDash when he accidentally made a wrong turn down a one-way street. Plaintiff's Additional Proposed Findings of Fact ("Pl. APFOF") ¶ 13. Defendant Taylor observed the wrong turn and pulled Plaintiff over for the traffic violation. Pl. APFOF ¶ 18. There was no other traffic on the street at that time and the wrong turn did not pose a danger to anyone. Pl. APFOF ¶ 14.

Most traffic offenses are minor offenses that often do not even result in a citation, let alone an arrest. Pl. APFOF ¶¶ 6–7, 9. Driving the wrong way down a one-way street is a minor traffic offense. Pl. APFOF ¶ 15. Defendant Taylor has let someone off with a warning after pulling them over for turning the wrong way down a one-way street, and is not aware of any incident in which an SPD officer arrested someone solely for turning the wrong way down a one-way street. Pl. APFOF ¶¶ 16. Defendant Taylor estimates that 85 to 90% of the traffic stops that he was involved in were resolved without a citation. Pl. APFOF ¶ 8.

The Defendant Officers had no prior knowledge of Plaintiff before the traffic stop. Pl. APFOF ¶ 19. The Defendant Officers had no information indicating Plaintiff had a criminal history, owned guns, or that the vehicle he was driving had been stolen. Pl. APFOF ¶ 20.

When Defendant Taylor initiated the traffic stop, Plaintiff immediately pulled over and did not try to evade Taylor. Pl. APFOF ¶ 21. Plaintiff began searching for his insurance paperwork in his glove compartment. Pl. APFOF ¶ 22. Defendant Taylor could see into Plaintiff's car because Plaintiff turned the dome light on, and Defendant Taylor never saw a weapon, drugs, or other contraband. Pl. APFOF ¶ 23. Defendant Taylor agrees that Plaintiff's movements that he observed were consistent with someone reaching into their glove box to get their insurance paperwork. Pl. APFOF ¶ 24.

Based on the movements he observed and nothing else, Defendant Taylor called for backup, stating "there's a lot of furtive movements, I'll take a second." Pl. APFOF ¶ 25. At the time of Plaintiff's so-called "furtive movements," Defendant Taylor had not yet given Plaintiff any orders, told him to sit still, or had any other communication with him. Pl. APFOF ¶ 26. When Defendant Taylor called for backup, he had no information that Plaintiff was armed, and Plaintiff had been totally compliant. Pl. APFOF ¶ 28. Within minutes, Defendants Gaard and Sgt. Matthew Brown, and non-defendant officers Jason Moen and Dylan Crist, arrived on the scene. Pl. APFOF ¶ 29. When Defendant Gaard arrived, she assumed that the reason for the traffic stop was that Plaintiff had driven the wrong way down a one-way street, based on the way the cars were positioned. Pl. APFOF ¶ 30. All five officers were armed with handguns and Tasers. Pl. APFOF ¶ 31. Defendants were all physically larger than Plaintiff, who was 5'7" tall and weighed 140 pounds. Pl. APFOF ¶¶ 1–4.

Defendants Taylor, Gaard, and Brown all drew their firearms. Pl. APFOF ¶ 32. Taylor and Gaard drew their firearms while Plaintiff was still inside his vehicle, at which time Plaintiff had been totally compliant. Pl. APFOF ¶¶ 33. None of the Defendant Officers observed any other occupants in Plaintiff's vehicle, and there was no information that suggested there was anyone else in the vehicle. Pl. APFOF ¶ 34.

Defendants Brown and Taylor ordered Plaintiff to show his hands, and Plaintiff complied. Pl. APFOF ¶ 35. Defendant Taylor told Plaintiff to open his car door with his left hand, and Plaintiff tried to do so but found that the door was locked. Pl. APFOF ¶ 36. Plaintiff unlocked his car door after Defendant Taylor instructed him to do so. Pl. APFOF ¶ 37.

Defendant Taylor ordered Plaintiff to exit his car, and Plaintiff complied. Pl. APFOF ¶ 38. Plaintiff saw that he was surrounded by multiple police cars and many officers, and he saw bright lights and lasers, which he believed were attached to guns. Pl. APFOF ¶¶ 39. Plaintiff believed he saw two officers pointing guns at him, but it was difficult to tell. Pl. APFOF ¶¶ 40. Plaintiff had no idea what was going on, why there were so many officers present, or why the officers were pointing guns at him, and he was confused because the traffic stop was not unfolding like a normal traffic stop that he had experienced before. Pl. APFOF ¶¶ 41. Plaintiff believed the whole situation was illegal as it was unfolding. Pl. APFOF ¶¶ 122. The Defendant Officers could see him and could see that he was not a large person. Pl. APFOF ¶ 42.

After Plaintiff exited his vehicle, Defendant Taylor pointed his gun at him, and Defendant Gaard pointed her gun in Plaintiff's general vicinity. Pl. APFOF ¶¶ 43–44. Defendant Gaard was standing a few feet away from Defendant Taylor when she saw that he had his gun ointed at Plaintiff. Pl. APFOF ¶¶ 45–46. Defendant Gaard gave Taylor several instructions

4

throughout the traffic stop, which he listened to, and she told one of the other officers to "go less lethal," but she never gave Defendant Taylor such an instruction. Pl. APFOF ¶¶ 47.

When Plaintiff was exiting the car, Defendant Taylor told him twice to face away from the officers. Pl. APFOF ¶ 48. After Plaintiff exited the vehicle, he stood next to the driver's side of his vehicle with his hands in the air, facing away from the officers with his back to them and about 20–25 feet away from them. Pl. APFOF ¶ 49. Plaintiff then turned around with his hands raised in a questioning gesture, while asking what was happening. Pl. APFOF ¶ 50. Defendant Taylor ordered Plaintiff to face away from the officers, and Plaintiff complied, turning back around to face away from the officers. Pl. APFOF ¶ 51. Defendant Taylor commanded Plaintiff to put his hands on top of his head and interlace his fingers, and Plaintiff complied. Pl. APFOF ¶ 52. Plaintiff briefly turned again to face the officers with his hands on top of his head. Pl. APFOF ¶ 53. Defendant Taylor reminded Plaintiff to face away from him, and Plaintiff complied. Pl. APFOF ¶ 54.

Defendant Taylor ordered Plaintiff to start walking slowly backwards towards him, and Plaintiff complied, taking approximately ten steps backwards towards the officers with his hands in the air. Pl. APFOF ¶¶ 55–56. Defendant Taylor told Plaintiff to slow down, and Plaintiff did so. Pl. APFOF ¶ 57. Defendant Taylor then told Plaintiff to keep walking, and Plaintiff complied. Pl. APFOF ¶ 58. Plaintiff took approximately six more steps backwards towards the officers. Pl. APFOF ¶ 59. As he was doing so, Plaintiff said, "I feel like I'm being assaulted." Pl. APFOF ¶ 60. Plaintiff was told to put his hands on top of his head and he complied. Pl. APFOF ¶ 61. Plaintiff took a couple more steps backwards. Pl. APFOF ¶ 62.

Defendant Brown told Plaintiff to stop moving, and Plaintiff stopped walking backwards. Pl. APFOF ¶ 63. Plaintiff removed a bandana from his head and tossed it to the ground, then put

his hands in the air. Pl. APFOF ¶ 64. Defendant Brown told Plaintiff again to put his hands on his head and Plaintiff did so. Pl. APFOF ¶ 65. Plaintiff asked if Defendants had guns on him and what the lasers were, and no one answered him. Pl. APFOF ¶ 66. Plaintiff said, "I really do not feel like I am being treated well." Pl. APFOF ¶ 67.

Defendant Brown ordered Plaintiff to get down on his left knee three times. Pl. APFOF ¶ 68. Plaintiff said that he was a "citizen" and asked multiple times for an explanation of what was going on, but Defendants did not explain. Pl. APFOF ¶¶ 69–70. Instead, Defendant Gaard yelled, "Do it now, or you're going to get tased!" Pl. APFOF ¶ 71.

A few seconds later, Defendant Gaard fired her Taser at Plaintiff, striking him in his back and legs. Pl. APFOF ¶ 72. Plaintiff screamed and collapsed to the ground. Pl. APFOF ¶ 73. Multiple officers swarmed in and handcuffed him. Pl. APFOF ¶ 74. As he was being handcuffed, Defendant Gaard yelled, "Don't move or you're going to get tased again!" Pl. APFOF ¶ 75. While he was on the ground being handcuffed, Plaintiff sobbed, screamed, and exclaimed, "I'm going to die here, aren't I? Am I going to die?", "I want to go home," and "What did I do? What did I do?" Pl. APFOF ¶¶ 76–77.

At the time Defendant Gaard fired her Taser, Plaintiff was standing several feet away from Gaard, standing still, with his upper body turned slightly to the left, facing away from Defendant Gaard. Pl. APFOF ¶¶ 78, 80. Plaintiff was standing where he was standing because the officers directed him to go there. Pl. APFOF ¶¶ 79. Plaintiff's hands were raised and a few inches away from his head. Pl. APFOF ¶ 81. At that time, both Defendants Brown and Taylor had their guns drawn. Pl. APFOF ¶ 82.

Before Defendant Gaard fired her Taser, Defendant Taylor saw that she had her Taser unholstered. Pl. APFOF ¶ 83. Defendants Taylor and Brown also both saw the laser sights from

6

Gaard's Taser on Plaintiff's before she fired, and both heard Defendant Gaard warn Plaintiff that she was going to Tase him several seconds before she did so. Pl. APFOF ¶ 84–85. When they heard the warning, Defendant Brown was standing a few feet away from Gaard and Defendant Taylor was located approximately six feet away from her, and both could hear her clearly. Pl. APFOF ¶¶ 86–87. Defendant Taylor believes that Defendant Gaard should not have tased Plaintiff, especially given that Taylor was bigger and heavier than Plaintiff. Pl. APFOF ¶ 141. Tasers can cause death or serious injury, and use of such a weapon constitutes a significant use of force. Pl. APFOF ¶ 5.

Throughout the course of the traffic stop, four out of the five officers who were present shouted instructions at Plaintiff, sometimes at the exact same time, contravening SPD training that dictates that only one officer should give orders at a time because it can be confusing when multiple officers give orders at the same time. Pl. APFOF ¶ 88.

From the time Plaintiff got out of his car to the moment he was tased, the Defendant Officers did not observe any evidence that suggested that he was armed, such as any suspicious bulges that could have been a weapon. Pl. APFOF ¶ 99. Plaintiff never made any threatening movements prior to being tased: he never reached for his waistband, moved to grab a weapon, lunged at the officers, or got in a fighting stance. Pl. APFOF ¶¶ 100–01. Plaintiff was never rude, belligerent, verbally combative, or argumentative, and never made any verbal threats. Pl. APFOF ¶ 89. The Defendant Officers never observed any signs that Plaintiff was having a mental health episode, was intoxicated, or was trying to commit suicide by cop. Pl. APFOF ¶ 105.

Defendants claim that Plaintiff failed to comply with three of their commands: (1) to face away from them; (2) to keep his hands on top of his head; and (3) to get down on his left knee. Pl. APFOF ¶ 90. Plaintiff did not deliberately disobey any orders; he attempted to follow every

order to the best of his ability, but he was confused and scared, particularly because he believed there were guns pointed at him. Pl. APFOF ¶ 91. Plaintiff did not intend to violate the order to face away from the officers, he was merely trying to see what was going on and understand what was happening because he believed he was in grave danger. Pl. APFOF ¶ 92, 104. Plaintiff believed he was complying with the officers' commands to face away from them because his body remained facing away from them even when his head glanced slightly toward the officers. Pl. APFOF ¶ 93. He attempted to follow the officers' orders to get down on his left knee but he was confused and was not given enough time to comply before he was tased. Pl. APFOF ¶ 94. It was difficult for Plaintiff to follow the instruction to keep his hands on his head because he was confused, nervous, and scared because he believed there were guns pointed at him and he feared for his life. Pl. APFOF ¶ 95. Although Plaintiff occasionally removed his hands from his head, his hands stayed up the entire time. Pl. APFOF ¶ 96. Plaintiff's hands were visible to the officers from the time he exited his vehicle until the time he was tased, and he had nothing in his hands (with the exception of a few seconds when he removed his bandana from his head, an action which did not pose a threat to the officers). Pl. APFOF ¶ 97.

Plaintiff never actively or passively resisted arrest at any point during the incident. Pl. APFOF ¶¶ 106, 108. Defendant Taylor admits that Plaintiff never attempted to provide any physical resistance. Pl. APFOF ¶ 107. Plaintiff never tried to run and never said anything that indicated he might try to do so. Pl. APFOF ¶ 109. Plaintiff never did anything to physically prevent the officers from placing handcuffs on him. Pl. APFOF ¶ 124.

After he was tased, Defendant Gaard told Plaintiff twice that he was in this position because he was not following commands. Pl. APFOF ¶ 110. Plaintiff responded, "I pulled over right away, a bunch of cops showed up," and "I followed all your commands, I swear."

Pl. APFOF ¶ 111. He asked, "what didn't I do?" twice, and neither Defendant Gaard nor Defendant Taylor answered him. Pl. APFOF ¶ 112. Defendant Taylor heard Plaintiff say, "I mean, it's a lot of commands all at once." Pl. APFOF ¶ 113.

Plaintiff was arrested and Defendant Taylor drove Plaintiff to the local jail before releasing him without booking him into the jail. Pl. APFOF ¶¶ 114–15. During that time, Plaintiff told Defendant Taylor that he felt like he was cooperating during the traffic stop and that he tried to follow all the Defendants' orders but was scared, stressed, and did not know what was going on. Pl. APFOF ¶ 116.

After dropping Plaintiff back at his car, Defendant Taylor issued Plaintiff citations for driving the wrong way down a one-way street and resisting or obstructing an officer, both of which were charged as civil ordinance violations. Pl. APFOF ¶ 117. The sole basis for the obstructing ticket was that Plaintiff allegedly did not obey commands. Pl. APFOF ¶ 118.

Defendant Taylor did not believe that Plaintiff deliberately disobeyed orders to make the officers' jobs more difficult. Pl. APFOF ¶ 119. Taylor perceived that Plaintiff appeared confused, nervous, and anxious throughout the traffic stop, based on the high pitch of Plaintiff's voice, the statements he made, and the fact that he kept looking around and asking what was going on. Pl. APFOF ¶¶ 120–21. Defendant Taylor believed that the officers' ability to arrest Plaintiff was not impeded and that Plaintiff never did anything to physically prevent the officers from placing handcuffs on him. Pl. APFOF ¶¶ 123–24. All of the Defendant Officers have previously handcuffed suspects who were not down on their knees or who did not have their hands interlaced over their heads, including suspects they suspected might be armed. Pl. APFOF ¶ 125. According to Defendant Taylor, the officers could have simply walked up to Plaintiff and handcuffed him. Pl. APFOF ¶ 126.

The night of the traffic stop, both Defendants Gaard and Brown gave Defendant Taylor advice regarding what charges to pursue against Plaintiff. Pl. APFOF ¶ 129. Both Defendants Gaard and Brown supported and encouraged Taylor's decision to charge Plaintiff with resisting or obstructing a police officer. Pl. APFOF ¶ 130. Defendant Taylor told Defendant Brown that he thought he had to arrest Plaintiff and charge Plaintiff criminally because force was used. Pl. APFOF ¶ 132. Defendant Brown told Defendant Taylor that he thought that "how [Plaintiff] interprets the world might be a little different than how we do," and Defendant Taylor agreed with him, and thought that might potentially explain why Plaintiff had difficulty following all of the officers' commands. Pl. APFOF ¶¶ 133, 135. Defendant Taylor interpreted Defendant Brown's statement as meaning that Plaintiff did not follow commands because it was an elevated situation that would be stressful for someone like Plaintiff who had no criminal history. Pl. APFOF ¶ 124. At Defendant Brown's suggestion, Defendant Taylor charged Plaintiff with civil ordinance violations rather than criminal offenses. Pl. APFOF ¶ 136. On July 16, 2024, a jury acquitted Plaintiff of resisting or obstructing a police officer. Pl. APFOF ¶ 137.

As a result of this incident, Plaintiff has suffered from nightmares and repeated, frequent panic attacks which are often triggered by exposure to law enforcement and for which he has been prescribed medication. Pl. APFOF ¶ 138. Plaintiff sought mental health treatment for his trauma related to this incident and his therapist concluded that he suffers from symptoms of what might be Post-Traumatic Stress Disorder. Pl. APFOF ¶ 140.

## LEGAL STANDARD

Summary judgment is only warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). In determining the motion, the Court must construe all facts and reasonable inferences in the light most favorable to the nonmoving party. *Magin v. Monsanto Co.*, 420 F.3d 679, 686 (7th Cir. 2005). When an incident is captured on video, the Court should view the facts "in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 380–81 (2007). "At summary judgment a court may not assess the credibility of witnesses, choose between competing inferences or balance the relative weight of conflicting evidence; it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party." *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005). Summary judgment is not appropriate if the court must make "a choice of inferences" arising from undisputed facts. *Harley-Davidson Motor Co. v. PowerSports*, 319 F.3d 973, 989 (7th Cir. 2003) (cleaned up). The "choice between reasonable inferences from facts is a function of a fact-finder, and when multiple reasonable inferences exist on a genuine issue of material fact, summary judgment will not be appropriate." *Id.*

## ARGUMENT

**I.      Defendant Gaard is not entitled to summary judgment on Plaintiff's excessive force claim based on her use of the Taser**

The Fourth Amendment protects against unreasonable searches and seizures and forbids police officers from using "greater force than was reasonably necessary" to make an arrest. *Gonzalez v. City of Elgin*, 578 F.3d 526, 539 (7th Cir. 2009). Excessive force cases are analyzed under the Fourth Amendment's objective reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989). The "reasonableness of a particular use of force must be judged from the perspective of a reasonable officer at the scene. … [T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without

11

regard to their underlying intent or motivation." *Id.* at 396–97. The officer's subjective beliefs or motivations are irrelevant. *See id.* at 397.

In assessing reasonableness, courts often consider the three factors identified in *Graham:* "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396.

> **A.** **The record viewed in the light most favorable to Plaintiff mandates a finding that Defendant Gaard used excessive forcing by tasing a misdemeanant who was not actively resisting arrest**

It is well-established in the Seventh Circuit that "it is unreasonable for officers to deploy a [T]aser against a misdemeanant who is not actively resisting arrest." *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 730 (7th Cir. 2013). The Seventh Circuit recognizes that a Taser is a significant use of force. *Dockery v. Blackburn,* 911 F.3d 458, 467 (7th Cir. 2018); *Abbott*, 705 F.3d at 730 (calling the use of a Taser a "very significant intrusion on [the plaintiff's] Fourth Amendment interests"). Courts in this Circuit have repeatedly held that officers violate the Fourth Amendment when they tase individuals suspected of minor offenses who are not actively resisting arrest. *See Abbott*, 705 F.3d at 729–30 (vacating summary judgment for officer who tased woman who had committed at most the minor misdemeanor of obstructing a peace officer, where there was no evidence that she was a threat and she at most "exhibited passive noncompliance" rather than active resistance by failing to comply with officers' orders); *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 863 (7th Cir. 2010) (reversing summary judgment for officers who tased man that disobeyed orders to release his arms for handcuffing because there was "no evidence suggesting that [he] violently resisted the officers' attempts to handcuff him"); *Skube v. Williamson*, 2015 WL 890363, at \*6, 8–9 (C.D. Ill. 2015) (denying summary judgment

for officers who tased a woman during a traffic stop who was not actively resisting but merely slow to comply with orders and questioning why she was being arrested, which was not active resistance); *Wendricks v. Serres*, 2022 WL 3700887, at \*9 (E.D. Wis. 2022) (denying summary judgment for officers because if jury were to accept plaintiff's version of events—that he was tased while at most passively resisting—it would mandate a finding that his clearly established constitutional rights were violated); *England v. City of Plymouth*, 2022 WL 17176820, at \*5 (N.D. Ind. 2022) (tasing an unarmed, non-threatening individual suspected of minor offense "unquestionably would exhibit unreasonable force").

As argued in Plaintiff's Motion for Partial Summary Judgment, Plaintiff is entitled to judgment as a matter of law on his excessive force claim based on Defendant Gaard's use of the Taser because viewing the evidence in the light most favorable to Defendant Gaard, it is undisputed that Plaintiff was not actively resisting arrest and her use of the taser was objectively unreasonable. *See* Dkt. 39 at 9–10. On Defendants' motion, where the record is viewed in the light most favorable *to Plaintiff*, there is no question that summary judgment should be denied as to this claim. The facts viewed in Plaintiff's favor are: (1) that Plaintiff was suspected of only a minor traffic violation (driving the wrong way on a one-way street) that did not even rise to the level of a misdemeanor but was rather charged as a civil ordinance violation; (2) that Plaintiff— who was unarmed, had his hands raised and visible throughout the entire encounter, was complying with the vast majority of the officers' orders, never made any threatening vocalizations or movements, and was outnumbered 5 to 1 by armed police officers who were physically larger than him—did not do anything that would cause an objectively reasonable officer to perceive that he posed a threat; and (3) that Plaintiff never actively resisted arrest or even passively resisted arrest. Pl. APFOF ¶¶ 1–4, 15, 21, 29, 31, 35–38, 51–52, 54, 55–59, 61–

63, 65, 89, 96–98, 100–01, 106–108, 117. Plaintiff attempted to comply with all of Defendants' orders and to the extent he failed to perfectly comply with a small minority of them, that failure was not "willful noncompliance" but was rather the inadvertent result of Plaintiff being confused, scared, and overwhelmed by the officers' inexplicably aggressive tactics. Pl. APFOF ¶ 91; *see Phillips v. Community Ins. Corp.*, 678 F.3d 513, 525 (7th Cir. 2012) (noting that it was unclear that plaintiff's perceived failure to follow orders to exit vehicle "could be considered resistance at all," but in any event "willful noncompliance" was different than "active resistance" and did not justify a significant use of force) (internal citations and quotation marks omitted). With the record properly construed, all three *Graham* factors weigh decisively in Plaintiff's favor, and it is clear that Gaard violated the Seventh Circuit's proscription against tasing misdemeanants who are not actively resisting arrest. *See Abbott*, 705 F.3d at 730.

Rather than engaging with that record, as they must, Defendants improperly present a version of the facts in the light most favorable to them with the benefit of inferences drawn in their favor. Defendants propose that at the time Defendant Gaard deployed her Taser, she faced the following:

> [A] suspect who had made furtive movements in the vehicle; a suspect who had already refused multiple loud, clear commands; a suspect who was moving towards officers after failing to keep his hands on his head and face away from officers; and a suspect exhibiting target-glancing behaviors consistent with imminent assault or flight.

Dkt. 31, Defs.' Brief in Supp. of Mot. for Summary Judgment, at 10. Accepting any part of that description requires turning the summary judgment standard on its head and viewing the record in Defendants' favor.

First, a reasonable jury would not have to accept Defendants' characterization that Plaintiff's movements in the vehicle were "furtive." *See Rainsberger v. Benner*, 913 F.3d 640, 646 (7th Cir. 2019) (noting that based on video evidence jury could conclude that officer

mischaracterized plaintiff's movements as "furtive"); *A.A. by Odeh v. Village of Orland Hills*, 2018 WL 4961517, at *6 (N.D. Ill. 2018) (noting that "a non-suspicious inference could be drawn" from movements that officers characterized as "furtive"). A reasonable "non-suspicious inference" would be that Plaintiff was simply reaching into his glove box for his insurance paperwork. That action occurs in a high percentage of traffic stops, Plaintiff testified that that is what he was in fact doing, and Defendant Taylor conceded that Plaintiff's movements were consistent with that behavior. Pl. APFOF ¶ 11, 22, 24. Therefore, a jury could easily conclude that a reasonable officer would not perceive that Plaintiff was doing anything suspicious in the vehicle. That benign interpretation is bolstered by the fact that Plaintiff turned his dome light on after he pulled over and kept it on the entire time, making it easier for Taylor to see into the car and cutting against the reasonableness of a perception that Plaintiff was up to no good. Pl. APFOF ¶ 23. Finally, even if the jury accepts Taylor's perception of Plaintiff's movements in the vehicle as "furtive," it is undisputed that there is no evidence that Plaintiff was armed after he left the vehicle, and therefore the so-called "furtive movements" are too remote in time from the use of the Taser to be relevant to the excessive force analysis. Pl. APFOF ¶ 99; *see Miller v. Gonzalez*, 761 F.3d 822, 829 (7th Cir. 2014) (reversing summary judgment for officer because the prohibition against using significant force on suspects who are only passively resisting arrest "applies notwithstanding a suspect's previous behavior—including resisting arrest, threatening officer safety, or potentially carrying a weapon").

Second, a reasonable jury would not have to accept Defendants' characterization that Plaintiff "refused multiple loud, clear commands." As discussed above, Plaintiff testified that he did not deliberately disobey any commands, but was rather doing his best to comply but was confused and scared, especially given that there were multiple guns trained on him and he

believed his life was in danger. Pl. APFOF ¶ 91. Moreover, Plaintiff's external behavior before he was tased demonstrated as much: he repeatedly asked for an explanation of what was going on, asked if there were guns pointed at him, and said he felt like he was being assaulted. Pl. APFOF ¶ 60, 66, 69. Defendant Taylor thought based on Plaintiff's statements and the pitch of his voice throughout the traffic stop that Plaintiff seemed confused, nervous, anxious, and like he did not know what he was going on. Pl. APFOF ¶ 120. Further, Plaintiff complied with the vast majority of the commands, and even for the commands that he did not obey perfectly, he repeatedly complied after being reminded to do so. Pl. APFOF ¶ 21, 35–38, 51, 54, 55–59, 61–63, 65. Plaintiff is entitled to the reasonable inference that he was clearly trying his best to comply but was struggling with the barrage of instructions. Defendant Gaard gave Plaintiff only seconds in between warning him that he would be tased and tasing him, and a jury could reasonably conclude that based on his past behavior, Plaintiff would have complied if Gaard had given him a few more seconds.[1] Pl. APFOF ¶¶ 71–72. Therefore a jury could conclude that Plaintiff did not "refuse" any orders and a reasonable officer would have perceived as much. *See Brown v. Haddon Township*, 2021 WL 2821199, at \*5 (D.N.J. Jul. 7 2021) (denying summary judgment for officers because whether plaintiff "was resisting [the officers'] commands or was confused by [the officers'] commands" was a dispute of fact that must be decided by a jury).

Likewise, a jury could reasonably determine that Defendants' commands were not "clear." Throughout the course of the traffic stop, four out of the five officers who were present shouted instructions at Plaintiff, sometimes at the exact same time, contravening SPD training that dictates that only one officer should give orders at a time because it can be confusing when

---

[1] In their argument on Plaintiff's failure to intervene claim, Defendants argue that there was not enough time for Defendants Brown and Taylor to even utter a word in between Gaard's warning and her deployment of the Taser. Dkt. 31 at 12. The fact that Defendants believe they did not have enough time to speak strongly supports that Plaintiff was not given enough time to physically comply, further supporting that the tasing was unreasonable.

multiple officers give orders at the same time. Pl. APFOF ¶ 88. Courts have repeatedly recognized that such tactics can be confusing and weigh against the reasonableness of a use of force in response to perceived noncompliance. *See Releford v. City of Tukwila*, 2009 WL 497131, at *13 (W.D. Wash. Feb. 25 2009) (denying summary judgment for officers who tased plaintiff for failing to comply with order to turn around and put his hands behind his back because multiple officers issued the command simultaneously, which "may have been confusing," and plaintiff had his hands raised and was asking legitimate questions about why he was being arrested, noting that plaintiff's behavior suggested not resistance but "at least a partial willingness to comply"); *Neal v. Ficcadenti*, 2017 WL 2937945, at *5 (D. Minn. July 10, 2017) (denying summary judgment for officers where plaintiff's "attempts at compliance were complicated by the fact that more than one officer was shouting directions at him, making it hard for him to know what to do," and jury could conclude based on video that plaintiff was earnestly attempting to comply); *Finch v. City of Wichita, Kansas*, 2020 WL 3403121, at *9 (D. Kan. Jun. 19, 2020) (denying summary judgment for officers where commands were confusing because multiple officers in multiple locations were yelling commands simultaneously).

Next, it is disputed that Plaintiff was "moving towards officers" at the time Defendant Gaard tased him. The video shows that at the time Plaintiff was tased, he was standing still, facing away from Defendant Gaard and slightly to the left, located several feet away from her. Pl. APFOF ¶ 80. Over 30 seconds before he was tased, Plaintiff had stopped walking backwards towards the officers in response to Defendant Brown's instruction to do so. Pl. APFOF ¶ 63, 72. To the extent that the statement "moving towards officers" (and Defendants' similar assertion that Plaintiff was "closing distance," dkt. 31 at 9) implies that Plaintiff's movement posed a threat, it is a complete mischaracterization of the record. While it is true that Plaintiff walked

backwards approximately 20 to 25 feet from next to his vehicle to several feet away from where the officers were standing near their squad cars, he did so because Defendants directed him to do so. Pl. APFOF ¶ 55–59, 62–63. A jury could not possibly conclude that Plaintiff's compliance with Defendants' explicit instructions somehow created a threat that justified the use of a Taser.

Finally, a reasonable jury would not be required to conclude that Plaintiff was "exhibiting target-glancing behaviors consistent with imminent assault or flight." That proposed fact requires the benefit of multiple inferences in Defendants' favor and therefore has no place in the analysis on Defendants' motion.[2] The Court must accept Plaintiff's version: that he never engaged in any "target glancing" but was merely looking around trying to understand what was going on given the confusing and scary circumstances. Pl. APFOF ¶ 104. The video shows that on the first occasion that Plaintiff turned to look toward the officers, he was asking what was going on and raising his hands in a questioning gesture. Pl. APFOF ¶ 50. The second time was a few seconds later, when he was still standing next to his car approximately 20–25 feet away from the officers, and he appeared baffled by what was happening. Pl. APFOF ¶ 53. The remaining instances when Plaintiff looked at the officers were not full turns of his body, but rather slight turns of his head, and again, there is no objective evidence in the video that suggests Plaintiff had any intention to attack the officers. Dkt. 33, Defs.' Proposed Findings of Fact ¶¶ 49, 51. A jury could conclude that an objectively reasonable officer would have perceived these turns of Plaintiff's head as a natural reaction to look towards the officer who was giving him instructions to try to understand the instructions and what he was supposed to do. Indeed, Defendant Taylor testified that he perceived that Plaintiff was looking around because he was confused. Pl. APFOF ¶ 120. While

---

[2] Defendants' assertions regarding "target glancing" should also be rejected because they are based solely on Gaard's subjective perceptions. *See McCollum v. Drewitz*, 2022 WL 4776279, at *3 n. 4 (E.D. Wis. 2022) (disregarding officers' proffered "facts" that were based on their subjective beliefs—such as that they suspected plaintiff may have been armed—as irrelevant to excessive force analysis).

his subjective perception is not dispositive, it supports that an objectively reasonable officer would have perceived the same and that a jury would agree.

Defendant Gaard testified that she never knows why a subject looks at officers, and that "target glancing" essentially means that the subject looked at them. Pl. APFOF ¶ 102. As the movants, Defendants are not entitled to the unreasonable inference that an objectively reasonable officer would have believed that Plaintiff was planning to attack the officers merely because he looked at them, and this Court should reject any such suggestion. *See Phillips*, 678 F.3d at 527 ("Permitting substantial escalation of force in response to passive non-compliance would be incompatible with our excessive force doctrine and would likely bring more injured citizens before our courts.")

Defendants' characterization of the situation as a "high-risk traffic stop" should also be rejected. Dkt. 31 at 1–2, 12. Viewing the record in the light most favorable to Plaintiff, he never did anything that would cause an objectively reasonable officer to perceive any heightened risk beyond that of a routine traffic stop. *See Brown v. City of Milwaukee*, 288 F. Supp. 2d 962, 977, 977 n. 10 (E.D. Wis. 2003) (noting that defendants' characterization of traffic stop as a "high-risk felony stop did not grant the officers license to abuse plaintiff," and that it was "impossible to accept [defendants'] characterization of this seizure as one involving high risk").

In addition, Defendants assert that "[c]ourts consistently hold that deploying a taser against an actively resisting or potentially assaultive individual is reasonable and does not violate clearly established law." Dkt. 31 at 9. Defendants do not point to any evidence that would suggest that Plaintiff ever actively resisted arrest, and, as discussed, the record viewed in the light most favorable to Plaintiff shows that he was not resisting at all. Pl. APFOF ¶ 108. Even viewed in the light most favorable to Defendants (which again, is not appropriate on this

motion), Plaintiff displayed *at most* non-compliance, which amounts to passive resistance and does not justify a significant use of force like a Taser. *See Phillips*, 678 F.3d at 525–26 (reversing jury verdict for defendants, because, as a matter of law, officers used excessive force when they shot a woman with rubber bullets after she disobeyed repeated orders to come out of her car, noting that "[t]o the extent that Phillips's perceived conduct could be considered 'resistance' at all, it would have been passive noncompliance of a different nature than the struggling that we have found warrants escalation of force"); *Miller*, 761 F.3d at 829 (reversing summary judgment for officer because "the law is clearly established that police officers cannot use 'significant' force on suspects who are only passively resisting arrest," which included suspect disobeying an order to put his hands behind his back); *Becker v. Elfreich*, 821 F.3d 920, 927 (7th Cir. 2016) (failure to follow order to "get on the ground" was at most passive noncompliance, not active resistance warranting significant use of force); *Holte v. City of Eau Claire*, 2021 WL 2530990, at *5 (W.D. Wis. 2021) (Peterson, J.) (suspect was not actively resisting where he was disobeying officers' orders to show his hands, but otherwise sitting still in a nonthreatening manner, because noncompliance constitutes only passive resistance and does not justify an escalation of force); *Mitchell v. City of Decatur*, 528 F. Supp. 3d 904, 915 (C.D. Ill. 2021) (failure to comply with orders to drop gun and get on the ground amounted only to passive resistance, not active resistance).

Similarly, there is no evidence that Plaintiff engaged in any "potentially assaultive" behavior. Dkt. 31 at 9. Defendants do not specify to what that phrase refers, but presumably it is another reference to Plaintiff supposedly "target glancing," which, as discussed, cannot be accepted for purposes of this motion.

In addition, neither of the cases that Defendants rely on support that "target glancing" (or "potentially assaultive" behavior more broadly) can justify the use of a Taser. Dkt. 31 at 9. In *Clarett v. Roberts*, 657 F.3d 664, 674–75 (7th Cir. 2011), the Seventh Circuit determined that a Taser deployment was reasonable where the subject was refusing to move while blocking the officers' only entrance to a room where they reasonably believed their fellow officers were in danger.[3] That fact pattern is not remotely analogous to the circumstances here, where Plaintiff was standing in plain view in an open street, not obstructing the Defendants' ability to get anywhere, and was standing precisely where they told him to stand. In *Clarett*, the officers' subsequent deployments of the Taser were not in response to "potentially assaultive" behavior, they were in response to actually assaultive behavior: the suspect was kicking at the officers. *Id.* at 675. In *United States v. Norris*, 640 F.3d 295, 303 (7th Cir. 2011), the suspect attempted to flee from the officers into his home, where he could have accessed a weapon, and "engaged in actions that suggested he was reaching for a weapon." In other words, unlike Plaintiff, in *Clarett* and *Norris* both plaintiffs actively resisted arrest. Neither case has anything whatsoever to say about "target glancing."

In sum, Defendants' arguments depend on misrepresentations of both fact and law, and they are not entitled to summary judgment on this claim.

**B.     Defendant Gaard is not entitled to qualified immunity**

Defendant Gaard's argument that she is entitled to qualified immunity relies on the same misrepresentations, and therefore similarly fails. Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."

---

[3] *Clarett* was not at the summary judgment stage but was rather an appeal from a jury verdict in favor of the officers, so the court was required to view the record in the light most favorable to the officers. 657 F.3d at 674.

*Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). In evaluating qualified immunity, the court asks two questions: (1) whether the facts make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation. *Id.* at 232. A constitutional right is "clearly established" for qualified immunity purposes when "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Abbott*, 705 F.3d at 725. There does not need to be a case that is factually identical. *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002). "[A] right can be clearly established if the legal landscape surrounding the right clearly establishes the contours of the right." *Smith v. Finkley*, 10 F.4th 725, 743 (7th Cir. 2021). The Supreme Court has emphasized the "importance of drawing inferences in favor of the nonmovant" when deciding the "clearly established" prong of the qualified immunity analysis. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014)

As explained in the previous section, the facts in this case taken in the light most favorable to Plaintiff easily make out a violation of Plaintiff's constitutional right to be free from excessive force. In February 2024, the right was clearly established such that any reasonable officer would have been aware that their conduct was unlawful. The Seventh Circuit has long recognized that "police officers [can] not use significant force on non-resisting or passively resisting suspects" and that "it is unreasonable for officers to deploy a [T]aser against a misdemeanant who is not actively resisting arrest." *See, e.g. Abbott*, 705 F.3d at 730, 732. In *Abbott*, which was decided in 2013, and which the Defendants inexplicably ignore in the qualified immunity section of their brief, dkt. 31 at 16–17, the Seventh Circuit reversed a denial of qualified immunity for an officer who tased a woman suspected of obstructing an officer after she failed to follow the officer's commands to turn over onto her stomach, finding she at most

22

exhibited passive noncompliance and not active resistance, and it was clearly established that the use of the Taser was unlawful under those circumstances. *Id.* at 729–30, 732–34. Those facts are highly analogous to Plaintiff's case: like the Plaintiff in *Abbott*, Plaintiff was tased after he failed to follow their instructions, exhibiting at most noncompliance rather than active resistance.

The Seventh Circuit has reiterated that holding on multiple occasions. *See Dockery*, 911 F.3d at 467 (noting that one of the court's "guideposts" in excessive force cases is that "an officer may not use significant force (like a Taser) against a non-resisting or passively resisting subject"); *Ferguson v. McDonough*, 13 F.4th 574, 583–84 (7th Cir. 2021) (affirming denial of qualified immunity for officer because of factual disputes regarding whether subject was actively resisting at the time he was tased, noting that "[i]t is unreasonable for an officer to use significant force against a passively resisting suspect"). Applying those precedents, district courts in this Circuit have repeatedly concluded that the use of a Taser under analogous circumstances violated clearly established law. *See Skube*, 2015 WL 890363, at *10 (in 2015, finding that officer who tased woman who was argumentative and non-compliant but never actively resisted during traffic stop was not entitled to qualified immunity); *Wielepski v. City of West Allis, Wisconsin*, 2018 WL 11206304, at *5–7 (E.D. Wis. 2018) (denying qualified immunity for officers who tased man who was only passively resisting by disobeying order to get down on the ground, noting that the law at the time of plaintiff's arrest was clear that officers may not, without provocation, tase a noncompliant misdemeanant); *Wendricks*, 2022 WL 3700887, at *9 (noting in 2022 that the law has been clear for many years that officers "cannot use substantial force against an individual who is not actively resisting," and denying qualified immunity for officers who tased man who maintained he was not actively resisting); *England*, 2022 WL 17176820 at

*6 (noting that "[i]n 2018, it was well-established that tasing a passively resisting or non-resisting suspect violated the suspect's Fourth Amendment rights").

In February 2024, any reasonable officer would have known that using a Taser on Plaintiff, a non-violent arrestee suspected only of minor offenses who was not actively resisting arrest, was unconstitutional. Accordingly, qualified immunity should be denied.

## II. Defendants Taylor and Gaard are not entitled to summary judgment for pointing their firearms at Plaintiff without justification[4]

The Seventh Circuit has held that "gun pointing when an individual presents no danger is unreasonable and violates the Fourth Amendment." *Baird v. Renbarger*, 576 F.3d 340, 345 (7th Cir. 2009) (affirming denial of summary judgment for officer who detained plaintiffs by pointing sub-machine gun at them, where officer had no reason to think that plaintiffs were armed or posed a threat, the officer was investigating minor, non-violent offenses, and plaintiffs did not resist detention or attempt to flee); *see also Jacobs v. City of Chicago*, 215 F.3d 758, 773–74 (7th Cir. 2000) (pointing gun at man who was not resisting and posed no threat was not objectively reasonable). The Seventh Circuit has recognized that gun pointing "makes the encounter far more frightening than if the officer's gun remains holstered" and concluded that "where the danger of the encounter to the officer, though potentially serious, is not clear and present, the deliberate pointing of a gun at the suspect is problematic." *U.S. v. Serna-Barreto*, 842 F.2d 965, 967 (7th Cir. 1988). "It would be a sad day for the people of the United States if police had carte blanche to point a gun at each and every person of whom they had an 'articulable suspicion' of engaging in criminal activity." *Id.*

### A. A reasonable jury could conclude the use of the firearms was unreasonable

---

[4] Plaintiff is no longer pursuing an excessive force claim against Defendant Brown.

Viewing the record in the light most favorable to Plaintiff, Defendants Taylor and Gaard[5] pointed their guns at Plaintiff despite the fact that he was suspected only of a minor traffic violation, he was not resisting, and he posed no threat to the officers. Pl. APFOF ¶ 43–44. Again, all three *Graham* factors weigh in Plaintiff's favor. For the same reasons that a jury could conclude that Gaard's use of a Taser was unreasonable, a jury could likewise conclude it was unreasonable for the officers to point their guns at Plaintiff. *See Coleman v. Vang*, 2024 WL 1140907, at *5–6 (W.D. Wis. 2024) (denying summary judgment for officer who pointed guns at plaintiff during "high-risk traffic stop" when he had no reason to think plaintiff had committed any crime, let alone a severe one, and he could see that plaintiff was unarmed); *Brown*, 288 F. Supp. 2d at 975–76 (denying summary judgment for officers based on traffic stop in which multiple officers pointed their guns and yelled commands at woman who was suspected of possessing a firearm, but who was complying with commands and did not do anything to indicate she was dangerous); *Montgomery v. City of Chicago*, 2024 WL 4651836, at *6 (N.D. Ill. 2024) (denying summary judgment for officers who pointed guns at plaintiffs during traffic stop where, viewing the record in the light most favorable to plaintiffs, officers had "no reason to suspect they had done anything unlawful" other than a minor traffic violation).

Once again, Defendants' arguments to the contrary depend on twisting the record in their favor: they urge that it was reasonable to point their guns at Plaintiff because Plaintiff made "furtive movements" while he was in the car and because he "refus[ed] to follow commands." Dkt. 31 at 7, 8. But again, a reasonable jury would not have to accept those inferences. The record presented in the light most favorable to Plaintiff is that when Taylor and Gaard first began

---

[5] Defendants contend that it is undisputed that only Taylor pointed his gun at Plaintiff, dkt. 31 at 6, but that is not the case. Defendant Gaard testified that she pointed her gun at Plaintiff's vehicle as Plaintiff was exiting, and because Plaintiff was standing directly next to the vehicle, she was pointing her gun in Plaintiff's general vicinity. Pl. APFOF ¶ 44.

pointing their guns at Plaintiff, he had been totally compliant and had not done anything threatening. Pl. APFOF ¶ 33. Plaintiff pulled over right away and then began searching for his insurance paperwork, exactly what a law-abiding citizen is supposed to do when pulled over by the police. Pl. APFOF ¶ 21–22. He complied with the officers' orders to show his hands and get out of the car, and was met with multiple guns pointed at him. Pl. APFOF ¶¶ 35, 38–40. He kept his hands raised and visible throughout the encounter, and there was no evidence that he was armed or that he posed any danger whatsoever. Pl. APFOF ¶ 96–101. As discussed, a jury could conclude that a reasonable officer would have perceived that Plaintiff did not "refuse" any orders, but was rather doing his best to comply in a confusing and stressful situation. Under those circumstances, a jury could easily conclude that Defendants' pointing of their guns at Plaintiff was an objectively unreasonable overreaction.

**B.      Defendants are not entitled to qualified immunity**

Defendants Taylor and Gaard are not entitled to qualified immunity for pointing their guns at Plaintiff. In *Baird*, the Seventh Circuit held that "gun pointing when an individual presents no danger is unreasonable and violates the Fourth Amendment." 576 F.3d at 345; *see also Jacobs*, 215 F.3d at 773–74; *McDonald v. Haskins*, 966 F.2d 292, 294–95 (7th Cir. 1992) (holding a gun to the head of a child who posed no threat to officers was a clearly established constitutional violation). The court concluded that it was clearly established as of 2009 that when "[the officer] pointed a submachine gun at various people when there was no suggestion of danger, either from the alleged crime that was being investigated or the people he was targeting," he violated their constitutional rights. *Baird*, 576 F.3d at 346. While Gaard and Taylor pointed their handguns, not submachine guns, that distinction is not so significant that *Baird* would not suffice to put them on notice that their conduct was unlawful. *See McDonald*, 966 F.2d at 294

(previous case was sufficient to put officer on notice that gun pointing was unlawful, although officer in previous case was undercover and officer in *McDonald* was not, because that difference was "not a sufficient distinction"); *Chilcutt v. Santiago*, 2023 WL 4678583, at *4 (7th Cir. 2023) (emphasizing that, for purposes of the qualified immunity analysis, plaintiffs do not need to identify a case with "facts identical" to the officers' interpretation of what happened, simply one that would put them on notice that their conduct was unlawful).

Like the plaintiffs in *Baird*, Plaintiff was suspected of an incredibly minor offense, which was "a far cry from crimes that contain the use of force as an element, crimes involving possession of illegal weapons, or drug crimes, all of which are associated with violence." *Id.* at 344. And, like in *Baird*, when viewing the record in the light most favorable to Plaintiffs, "there was never a reason to suspect that there was any threat to the safety of the officers," and Plaintiff never "resisted detention or attempted to flee." *Id.* In some ways, the threat that Plaintiff posed to the officers was far less than the threat posed by the plaintiffs in *Baird*: in *Baird*, the individuals significantly outnumbered the officer, a circumstance that was reversed for Plaintiff. *Id.* at 343–44. In February 2024, *Baird*, *Jacobs*, and *McDonald* were sufficient to put Defendants on notice that their conduct was unlawful.[6]

---

[6] Other circuits have also overwhelmingly concluded that pointing guns at non-dangerous, non-threatening suspects violates the Fourth Amendment. *See Nazario v. Gutierrez*, 103 F.4th 213, 232 (4th Cir. 2024) (holding that it "can be unconstitutional to hold a person at prolonged gunpoint when he is compliant and presents no danger to the public or law enforcement officers"); *Castro v. Kory*, 2024 WL 1580175, at *4 (5th Cir. Apr. 11, 2024) (holding that, as of August 2018, it was clearly established that pointing a gun "at an unarmed, confused, and only mildly disruptive suspect" constitutes excessive force in violation of the Fourth Amendment); *Rosales v. Bradshaw*, 72 F.4th 1145, 1155-56 (10th Cir. 2023) (officer's use of force when seizing a motorist for a minor traffic violation was excessive when he pointed his weapon at the plaintiff, who remained calm and compliant); *Vanderhoef v. Dixon*, 938 F.3d 271, 277 (6th Cir. 2019) (officer holding motorist at gunpoint for about two minutes was objectively unreasonable under the Fourth Amendment); *Thompson v. Rahr*, 885 F.3d 582, 587 (9th Cir. 2018) (holding that "pointing guns at persons who are compliant and present no danger is a constitutional violation"); *Stamps v. Town of Framingham*, 813 F.3d 27, 30 (1st Cir. 2016) ("pointing a firearm at a person in a manner that creates a risk of harm incommensurate with any police necessity can amount to a Fourth Amendment violation"); *Croom v. Balkwill*, 645 F.3d 1240, 1252 n.17 (11th Cir. 2011) ("An officer's decision to point a gun at an unarmed civilian who objectively poses no threat to the officer or the public can certainly sustain a claim of excessive force."); *Robinson v. Solano*

Consistent with that precedent, district courts in this Circuit have consistently concluded that similar uses of firearms against non-threatening subjects suspected of minor offenses during traffic stops violated clearly established law, even where the officers had a specific reason to believe the suspect possessed a firearm. *See Brown*, 288 F. Supp. 2d at 975–76 (in 1998, it was clearly established that pointing firearms at woman during traffic stop who was suspected of possessing a gun but was complying with commands and did not do anything to indicate she was dangerous was unlawful); *Montgomery*, 2024 WL 4651836, at *6 (in 2020, plaintiffs had a "clearly established right to be free from having a firearm pointed at them when they presented 'no hint of danger' to the officers who stopped them," rejecting officers' suspicions that plaintiffs had been involved in a shooting); *Coleman*, 2024 WL 1140907, at *10 (in 2019, it was clearly established that pointing guns at plaintiff during "high-risk traffic stop" when officer had no reason to think plaintiff had committed any crime, let alone a severe one, was unlawful); *Santiago v. United States*, 2022 WL 375516, at *6 (N.D. Ill. 2022) (in 2019, it was clearly established that pointing guns at suspects who posed no threat during traffic stop was unconstitutional); *see also Cruz v. City of Chicago*, 2021 WL 2645558, at *6 (N.D. Ill. June 28, 2021) ("[T]here needs to be a reason for pointing a lethal weapon at someone. Otherwise, a person enjoys a clearly established right not to be held at gunpoint.").

Defendants attempt to distinguish Plaintiff's case from the cases in which the Seventh Circuit has recognized an excessive force claim, but their efforts are unavailing. Dkt. 31 at 6, 15–16. Defendants focus on minute details from *Jacobs* and *McDonald*, pointing out that, unlike in

---

*County*, 278 F.3d 1007, 1015–16 (9th Cir. 2002) (*en banc*) (pointing a gun at an unarmed suspect with his hands up who posed no danger constituted excessive force); *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1192 (10th Cir. 2001) (pointing firearms at persons "should be predicated on at least a perceived risk of injury or danger to the officers or others"); *Baker v. Monroe Township*, 50 F.3d 1186, 1193–94 (3d Cir.1995) (detention at gunpoint violated the Fourth Amendment because there was "simply no evidence of anything that should have caused the officers to use the kind of force they are alleged to have used").

those cases, Defendants did not hold their guns against Plaintiff's head, did not threaten to pull the trigger, and Plaintiff was an adult not a child. But none of those facts were present in *Baird* either. There was no allegation that the officer in *Baird* threatened to pull the trigger or held his gun to the plaintiff's heads, and the court recognized that "pointing a gun at a compliant adult in a non-threatening situation, as in this case, can also constitute excessive force." 576 F.3d at 346. The three cases taken together stand for the proposition that pointing a gun at someone who poses no danger is unlawful. Therefore, Defendants had sufficient notice that they could not point their guns at Plaintiff—a non-threatening, unarmed man suspected of a minor driving error.

Defendants also cite *Rebolar v. City of Chicago*, 897 F. Supp. 2d 723, 729 (N.D. Ill. 2012), in which the court granted summary judgment for the officers on a gun pointing excessive force claim. Dkt. 31 at 8. But that case is distinguishable: the plaintiff in *Rebolar* was identified by description as a suspect wanted for breaking into cars. *Rebolar*, 897 F. Supp. 2d at 729–30, 736–37. That is a more serious offense than making a minor driving error. Furthermore, the plaintiff disobeyed orders to show his hands, a factor which could increase the level of perceived danger. *Id.* Plaintiff, by contrast, kept his hands raised and visible throughout the entire encounter, and Defendants could see that he had no weapon in his hands. Therefore *Rebolar* was not a situation, like *Baird*, where the suspect presented no threat to the officers.

Defendants further rely on *Anderson v. City of West Bend Police Dep't*, 774 F. Supp. 2d 925 (E.D. Wis. 2011), but that case in fact supports that Defendants were on notice that their conduct was unlawful. Dkt. 31 at 15–16. In *Anderson*, the court ruled for the plaintiff on the first prong of the qualified immunity analysis. 774 F. Supp. 2d at 946–48. The court found that a jury could conclude that the defendants violated the plaintiff's rights by pointing their guns at her when she was slow to comply with orders, but was not resisting arrest, and the officers had no

reason to believe that she posed a threat. *Id.* Although the court granted qualified immunity on the clearly established prong, the fact that the court found a jury question on the first prong would serve as notice in 2024 that Defendants' conduct was unlawful. *Id.* at 949–50. Furthermore, the underlying incident in *Anderson* occurred in July 2008, *id.* at 932, and so pre-dated *Baird*, a 2009 decision. Finally, *Anderson* is distinguishable on the facts. In *Anderson*, the court found that there were exigent circumstances justifying a warrantless entry into an apartment because the officers were responding to a domestic violence call and there was a threat of violence, an "inherently dangerous" situation. *Id.* at 939–42. The court further found that one officer pointed his gun at the plaintiff "out of surprise" and the other did so because a second person, who posed a greater threat, was present and unsecured in the room. *Id.* at 951. On those undisputed facts, the court concluded that the case fell within the "hazy border between excessive and acceptable force." *Id.* at 950. Plaintiff's case—in which officers were responding to a non-violent traffic violation, Plaintiff was always in plain view and never did anything to "surprise" the officers, and the officers had no reason to believe anyone else was present—is not "borderline," but rather presents a clear constitutional violation under clearly established law.

Defendants also argue, baselessly, that the use of force was not excessive because "Plaintiff did not even know they had their firearms unholstered." Dkt 31 at 16. That is untrue. Plaintiff testified that he believed he saw two officers pointing guns at him, and that he certainly saw lasers which caused him to believe the Defendants were pointing guns at him. Pl. APFOF ¶ 40–41. Plaintiff testified that the guns terrified him, and that terror is supported by the objective evidence. Pl. APFOF ¶¶ 91, 95, 104. Plaintiff can be heard on the video asking if the officers were pointing guns at him and what the lasers were, and immediately after he was tased he said, "I'm going to die here, aren't I?" Pl. APFOF ¶ 66, 76. Contrary to Defendants' assertions, a jury

could reasonably conclude that Defendants' conduct—terrorizing a DoorDash driver who made a wrong turn—was "egregious." Defendants are not entitled to qualified immunity on this claim.

### III. Plaintiff's failure to intervene claims must be decided by a jury[7]

In a 42 U.S.C. § 1983 action based on excessive force, officers can be held accountable for failing to take reasonable steps to attempt to stop excessive force by fellow officers, provided they had a realistic opportunity to intervene to prevent the act from occurring. *See Sanchez v. City of Chicago*, 700 F.3d 919, 926 (7th Cir. 2012); *Lewis v. Downey*, 581 F.3d 467, 472 (7th Cir. 2009). A "realistic opportunity" means a chance to warn the officer using excessive force to stop. *Miller*, 761 F.3d at 826. "Whether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Lanigan v. Village of East Hazel Crest, Ill.*, 110 F.3d 467, 478 (7th Cir. 1997).

Both Defendants Taylor and Brown had a realistic opportunity to prevent Defendant Gaard from deploying the Taser. Defendant Taylor saw that Gaard had unholstered her Taser well before she deployed it, and both Defendants Taylor and Brown saw the laser sights from the Taser on Plaintiff's back some time before Gaard fired. Pl. APFOF ¶¶ 83–84. Both officers also heard Gaard's warning that she was going to tase Plaintiff several seconds before she did so. Pl. APFOF ¶ 85. When Defendant Gaard gave the Taser warning, Defendant Taylor was standing approximately six feet away from her and Defendant Brown was within a couple feet of her. Pl. APFOF ¶¶ 86–87. Both could clearly hear her warning, and therefore it is reasonable to infer that she would have heard them if they told her to stop. Pl. APFOF ¶¶ 85–87. Based on

---

[7] Plaintiff is pursuing the following failure to intervene claims: against Defendants Brown and Taylor for failing to intervene in Defendant Gaard's use of the Taser, and against Defendant Gaard based on Defendant Taylor's use of his firearm.

those facts, Plaintiff has presented enough evidence to go to a jury on this claim. *See Pullen v. House*, 88 F. Supp. 3d 927, 945 (W.D. Wis. 2015) (denying defendants' motion for summary judgment on failure to intervene claim where officer saw tasering officer draw taser before she fired it, providing a reasonable opportunity to warn her to stop); *Harris v. City of La Crosse*, 745 F. Supp. 3d 733, 754 (W.D. Wis. 2024) (denying summary judgment for officers where tasering officer yelled "Taser" seconds before he fired it, because a few seconds was enough time to raise a fact question as to whether officers could have told tasering officer not to fire); *Stabenow v. City of Eau Claire*, 546 F. Supp. 3d 787, 799 (W.D. Wis. 2021) (Peterson, J.) (collecting cases and noting that courts have repeatedly held that a few seconds is enough time for one officer to tell another officer to stop for purposes of a failure to intervene claim).

Likewise, Defendant Gaard had ample opportunity to intervene to tell Defendant Taylor to stop pointing his gun at Plaintiff. Defendant Gaard was standing a couple feet away from Defendant Taylor when she saw him point his gun at Plaintiff. Pl. APFOF ¶ 46. Defendant Gaard was a more experienced officer than Taylor, and she was, at various points, essentially coaching him through the traffic stop. Pl. APFOF ¶¶ 12, 47; Dkt. 33 ¶ 6. She gave Taylor several instructions that he listened to. Pl. APFOF ¶ 47. At one point, she instructed one of the other officers to "go less lethal," but she never gave Defendant Taylor such an instruction. Pl. APFOF ¶ 47. It is reasonable to assume that if Gaard had instructed Taylor to put his gun away, he would have followed her instruction. Therefore, Gaard had a reasonable opportunity to intervene in Taylor's excessive use of force, and Defendants' motion for summary judgment on the failure to intervene claims should be denied.

**IV.    Defendants are not entitled to summary judgment on Plaintiff's malicious prosecution claim**

Summary judgment is also not warranted on Plaintiff's state-law malicious prosecution claim regarding the obstructing charge. Under Wisconsin law, the tort of malicious prosecution has six elements:

(1) a prior institution or continuation of judicial proceedings against the plaintiff;
(2) the former proceedings were by, or at the instance of, the defendant in the action for malicious prosecution;
(3) the former proceedings terminated in favor of the plaintiff;
(4) the defendant acted with malice in instituting the former proceedings;
(5) there was a want of probable cause for the institution of the former proceedings; and
(6) the former proceedings caused the plaintiff damage.

*McCaigue v. Lawrence University*, 2024 WL 4945185, at *5 (Wis. Ct. App. 2024).

The first, third, and sixth elements are not in dispute: a judicial proceeding was instituted against Plaintiff that terminated in his favor when a jury acquitted him, and the proceeding caused Plaintiff damages. Dkt. 31 at 18–21.

As to the second element, Defendants maintain that only Defendant Taylor had any personal involvement in issuing the citation, dkt. 31 at 19, but that is not the case. While there is no question that the second element is met as to Taylor, given that he was the officer who issued the charge, Plaintiff has also alleged that Gaard and Brown took part in a conspiracy to maliciously prosecute Plaintiff. Dkt. 7, First Amended Complaint at ¶ 62. Specifically, Defendants Gaard and Brown advised Taylor on what charges to pursue and supported and encouraged his decision to charge Plaintiff with obstructing an officer. Pl. APFOF ¶¶ 129–30. Taylor was an inexperienced, probationary officer who was only on his second shift without a supervisor. Pl. APFOF ¶ 12. The videos show that he valued Gaard's and Brown's opinions and listened to their input regarding what charges to pursue. Gaard reminded Taylor to charge Plaintiff with the underlying reason for the traffic stop, and Taylor did so. Pl. APFOF ¶ 131. Brown suggested that Taylor issue a city ordinance violation for obstructing rather than criminal

charges, and Taylor did so. Pl. APFOF ¶ 136. It is reasonable to infer that Gaard and Brown's support and advice emboldened Taylor to issue the erroneous charge, and that without their support he would not have issued the obstructing ticket. That is sufficient personal involvement to hold Brown and Taylor liable for the malicious prosecution as co-conspirators. *See* Wis. JI-Civil § 2802 ("[I]f a defendant . . . with understanding of the unlawful character of a plan, intentionally encourages, advises, or assists, for the purpose of furthering the plan, he or she thereby becomes a knowing participant—a conspirator."); *Global Imaging Acquisitions Group, LLC v. Rubenstein*, 2015 WL 5618803, at \*2 (E.D. Wis. 2015) (allegations that defendants knew about unlawful plan and "intentionally encouraged" others to carry it out sufficiently alleged co-conspirator liability).

As for probable cause, a reasonable jury could find that Defendants lacked probable cause to charge Plaintiff with obstructing. An officer has probable cause when there is enough evidence such that an ordinary and reasonable lay person in the circumstances would believe the suspect had committed a crime. *McCaigue*, 2024 WL 4945185, at \*5 (citing *Pollock v. Vilter Mfg. Corp.*, 126 N.W.2d 602, 609 (Wis. 1964).[8] The Seventh Circuit has cautioned that "[w]e must be especially cautious when the evidence that is alleged to establish probable cause is entirely consistent with innocent behavior." *Moya v. U.S.*, 761 F.2d 322, 325 (7th Cir. 1984). Here, the crime in question was obstructing an officer, under Wisconsin Stat. § 946.41, which has four elements under Wisconsin law:

> (1) the defendant obstructed an officer;
> (2) the officer was doing an act in an official capacity;
> (3) the officer was acting with lawful authority; and

---

[8] Defendants cite the "arguable probable cause" standard. Dkt. 31 at 20. However "arguable probable cause" applies only when officers raise a federal qualified immunity defense, which is not available for Plaintiff's state-law malicious prosecution claim. *See Kelly v. Village of Lemont, Illinois*, 2021 WL 5493227, at \*6 (N.D. Ill. 2021). Therefore, the standard is probable cause, not arguable probable cause.

(4) the defendant knew that the officer was an officer acting in an official capacity and with lawful authority and that the defendant knew his conduct would obstruct the officer.

Wis. JI-Criminal 1766; *State v. Grobstick*, 546 N.W.2d 187, 189 (Wis. Ct. App. 1996). It is undisputed that the officers were acting in their official capacity, but a jury could find that the first, third, or fourth elements were not met.

First, when the record is viewed in the light most favorable to Plaintiff, there was no probable cause to believe that Plaintiff obstructed the officers. To obstruct means "the conduct of the defendant prevents or makes more difficult the performance of the officer's duties." Wis. JI-Criminal 1766. Under Wisconsin obstruction law, "[t]he action justifying an arrest for obstruction cannot simply 'inconvenience' the official; the action must make a difference in an official's ability to perform an official act." *McGowan v. City of Milwaukee*, 2022 WL 3354746, at *9 (E.D. Wis. 2022) (citing *Henes v. Morrissey*, 533 N.W.2d 802, 808 (Wis. 1995)). Here, the officers' ability to arrest Plaintiff was not impeded. Pl. APFOF ¶ 123. They were able to arrest him, and it is undisputed that he never did anything to physically prevent the officers from putting handcuffs on him. Pl. APFOF ¶¶ 114, 124. All of the officers testified that they have previously handcuffed suspects who were not down on a knee or who did not have their hands on their head, even suspects they believed may be armed. Pl. APFOF ¶ 125. It is also relevant that Plaintiff was given only seconds to comply with the order to get down on his knee before he was tased, Pl. APFOF ¶ 72, and it is impossible to see how that seconds-long delay could have amounted to more than an "inconvenience." Taylor admitted that the officers could have simply walked up to Plaintiff and handcuffed him. Pl. APFOF ¶ 126. Therefore, a jury could conclude that the Defendants lacked probable cause to believe that Plaintiff obstructed. *See McGowan*, 2022 WL 3354746, at *10 (denying summary judgment for officers where arrestees failed to

comply within seconds of dispersal orders, but there was a factual dispute as to whether that failure actually interfered with officers' ability to do their job, or merely inconvenienced them).

Second, a jury could determine that the officers were not acting with lawful authority. "Acting with 'lawful authority' means that the police conduct was in accordance with constitutional and statutory law." *State v. Wenger*, 2018 WL 3005014, at \*2 (Wis. Ct. App. 2018). As argued above, a jury could find that the officers were violating Plaintiff's constitutional rights by initiating an unreasonable and unwarranted "high-risk" traffic stop without justification and unreasonably pointing guns at him. The jury could therefore conclude that a reasonably prudent layperson would believe that Defendants were not acting with lawful authority. *See Rooni v. Biser*, 742 F.3d 737, 741–42 (7th Cir. 2014) (denying summary judgment for officer where jury could conclude that officer unlawfully assaulted plaintiff, and therefore officer lacked probable cause to arrest plaintiff for obstructing); *State v. Ferguson*, 767 N.W.2d 187, 193 (Wis. 2009) ("It is black letter law that a constitutional violation is an unlawful act").

Third, the evidence that Plaintiff *knowingly* obstructed is wholly insufficient to establish probable cause on that element. Wisconsin law emphasizes that officers "cannot look into a person's mind to find knowledge. Knowledge must be found, if found at all, from the defendant's acts, words, and statements, if any, and from all the facts and circumstances in [the] case bearing upon knowledge." Wis. JI-Criminal 1766; *State v. Lossman*, 348 N.W.2d 159, 167 (Wis. 1984). All of Plaintiff's words and actions during the traffic stop support that he did not knowingly obstruct because, again, they support that Plaintiff did not intentionally disobey any orders. Rather, Plaintiff's words and actions support that he was attempting to comply but was confused and scared. During the traffic stop, Plaintiff was repeatedly asking what was going on, he complied with most of the officers' orders, and even when he occasionally took his hands off

36

his head or turned around, he immediately corrected himself when reminded to do so. Pl. APFOF ¶¶ 21, 35–38, 51, 54, 55–59, 61–63, 65, 69. After he was tased, he was sobbing and screaming "What did I do? What did I do?" and a jury could believe that a reasonable person would find those questions authentic, indicating that Plaintiff had no idea why he had been tased or that he failed to follow any orders. Pl. APFOF ¶ 77. After he was tased, in a conversation that Taylor was present for, Plaintiff told Gaard, "I followed all your commands, I swear" and asked repeatedly, "what didn't I do?" Pl. APFOF ¶¶ 111–12. He also expressed how confusing the situation was, saying, "It's a lot of commands all at once." Pl. APFOF ¶ 113. Later, Plaintiff told Defendant Taylor that he felt like he was cooperating during the traffic stop and that he tried to follow all the Defendants' orders but was scared, stressed, and did not know what was going on. Pl. APFOF ¶ 116. A jury could look at all of that objective evidence and determine that a reasonable person would believe that Plaintiff did not deliberately disobey any orders. *See Rooni*, 742 at 741 (finding that plaintiff's "accidental" actions could not amount to obstruction, which must be "knowing").

Defendants' subjective assessments also support that a reasonable person would not have believed that Plaintiff deliberately disobeyed orders. Defendant Taylor admitted that he did not think that Plaintiff deliberately disobeyed orders to make the officers' jobs more difficult, which amounts to an admission that Plaintiff did not knowingly obstruct. Pl. APFOF ¶ 119. Taylor also believed that Plaintiff may have had difficulty following all of the officers' commands because the situation would be stressful for someone like Plaintiff, who had no criminal history. Pl. APFOF ¶ 134. In addition, Taylor and Brown interpreted Plaintiff's statements and actions during and after the traffic stop as indicating that Plaintiff was confused, scared, nervous, anxious, and that he did not know what was going on or why he was being arrested. Pl. APFOF

¶¶ 120–21, 128. Defendant Gaard agreed it was possible based on Plaintiff's statements that he was confused and did not know what was happening. Pl. APFOF ¶ 127.

In their brief, the only evidence that Defendants cite to suggest that Plaintiff deliberately disobeyed commands is that Plaintiff heard the commands and did not comply with all of them. Dkt. 31 at 20. But that evidence does not indicate that Plaintiff's failure to perfectly comply was intentional or knowing, particularly at summary judgment when all reasonable inferences must be drawn in Plaintiff's favor. A jury could agree that that evidence is unconvincing when stacked against the mountain of evidence that Plaintiff did not intentionally disobey any orders.

Furthermore, Defendants have no evidence that Plaintiff knew that they were acting with lawful authority, and Plaintiff's statements during the traffic stop demonstrate the opposite. Before he was tased, Plaintiff said, "I feel like I'm being assaulted" and "I really do not feel like I am being treated well." Pl. APFOF ¶¶ 60, 67. He asked for an explanation of what was happening while exclaiming that he is a "citizen." Pl. APFOF ¶¶ 69–70. Based on those statements, a jury could conclude that Plaintiff believed his rights were being violated, and that a reasonable officer would have perceived as much. Therefore, a jury could determine that Defendants lacked probable cause to believe that Plaintiff committed the crime of obstructing an officer. *See Pullen*, 88 F. Supp. 3d at 940 (denying defendants' summary judgment motion where jury could conclude that plaintiff did not believe officers were acting with lawful authority, and his response "simply reflected his surprise and fear"); *Brunner v. McKillip*, 488 F. Supp. 2d 775, 784 (W.D. Wis. 2007) (if plaintiff believed her arrest was unlawful, defendants would have no probable cause to arrest her for violating Wis. Stat. § 946.41(1)).

Defendants cite cases for the proposition that disobeying a police officer's orders can provide probable cause that a suspect violated § 946.41. Dkt. 31 at 20. But they overlook the

critical requirement that the disobedience must be deliberate. In all of the cases that Defendants cite, the evidence showed that the suspects intentionally disobeyed orders. *See United States v. Bogan*, 2017 WL 9485688, at *2 (E.D. Wis. Sept. 26, 2017) (suspect intentionally refused orders to exit vehicle); *Prip v. Erwin*, 2015 WL 4394526, at *5 (W.D. Wis. July 16, 2015) (protester who was engaging in civil disobedience willfully refused orders to disperse); *Pullen*, 88 F. Supp. 3d at 936–37 (suspect willfully refused orders to get back in car);[9] *Stabenow v. City of Eau Claire*, 546 F. Supp. 3d 787, 800 (W.D. Wis. 2021) (suspect intentionally reached into pocket to grab knife after being ordered not to do so); *Harris*, 745 F. Supp. 3d at 751 (suspect intentionally disobeyed orders to exit vehicle). None of those cases are applicable to the circumstances here, where Plaintiff's failures to perfectly comply were inadvertent, and he was not given enough time to comply with the order to get down on his knee.[10]

Finally, there is a genuine issue of material fact as to whether the officers acted with malice, which precludes summary judgment. Malice can be established by showing the defendant "acted chiefly from motives of ill will" or that their "primary purpose was something other than the social one of bringing an offender to justice." *McCaigue*, 2024 WL 4945185, at *8. Malice can be demonstrated by showing a "willful and wanton disregard for the facts" when that disregard "evince[s] a hostile or vindictive motive." *Id.* Here, a jury could conclude that Defendants willfully and wantonly disregarded the facts, for all the reasons stated above. Furthermore, malice can be inferred from lack of probable cause. *Carlyle Nursing Home v. Carlyle Associates*, 1987 WL 267570, at *2 (Wis. Ct. App. 1987) (citing *Elmer v. Chicago & N.*

---

[9] In *Pullen*, the court concluded that there was probable cause that plaintiff resisted only on plaintiff's affirmative summary judgment motion, when the record was construed in defendants' favor. *Pullen*, 88 F.Supp.3d at 941–42.
[10] In addition, in four out the five cases that Defendants cite, the court was applying the "arguable probable cause" standard, which is not applicable here. *Harris*, 745 F. Supp. 3d at 751; *Pullen*, 88 F.Supp.3d at 938; *Prip*, 2015 WL 4394526, at *5; *Stabenow*, 546 F.Supp.3d at 800.

*W. R. Co.*, 43 N.W.2d 244, 246 (1950)). Moreover, a jury could conclude that Defendants acted for an improper purpose, namely to cover up their unlawful use of excessive force. *McCaigue*, 2024 WL 4945185, at *8 (allegations that defendant "acted with the primary purpose of avoiding blame for her own unlawful conduct, rather than for the social purpose of bringing an offender to justice" were sufficient to establish malice). Taylor stated that he thought he had to arrest and charge Plaintiff because force was used. Pl. APFOF ¶ 132. Moreover, Taylor admitted that he did not believe Plaintiff acted deliberately to make their jobs difficult, essentially admitting that he did not think Plaintiff knowingly obstructed. Pl. APFOF ¶ 119. On that record, a jury could conclude that Defendants acted with malice, and accordingly Defendants' motion for summary judgment on this claim should be denied.

**V.     Defendants are not entitled to summary judgment on Plaintiff's intentional infliction of emotional distress claim**

Defendants assert that Plaintiff's intentional infliction of emotional distress claim should be dismissed because "none of their decisions were motivated by malicious intent," their actions do not constitute extreme and outrageous conduct, and they did not result in an extreme disabling condition. Dkt. 31 at 21–22. These arguments fail because, like Defendants' other arguments, they are based on a version of the facts viewed in the light most favorable to them in contravention of the summary judgment standard. When all reasonable inferences are drawn in Plaintiff's favor, a reasonable jury could conclude that Defendant Gaard tased Plaintiff without justification, Defendants Taylor and Gaard pointed their guns at Plaintiff without justification, and all three Defendants caused Plaintiff to be prosecuted for obstructing in order to cover up their misconduct. Minutes after she tased Plaintiff, Gaard candidly told Plaintiff twice that she tased him because he was not following commands. Pl. APFOF ¶ 110. A jury could interpret those statements and the video evidence as indicating that Gaard tased Plaintiff not because she

40

perceived any threat, but because she was impatient with what she viewed as Plaintiff's noncompliance, and she wanted to cause him pain. Based on this evidence, a reasonable jury could infer that the Defendants intended to cause Plaintiff emotional distress and that their conduct was extreme and outrageous. *See McKissick v. Schroeder*, 235 N.W.2d 686 (Wis. 1975) ("An intent to cause emotional distress can reasonably be inferred from actions."); Restatement (Second) of Torts § 46 Outrageous Conduct Causing Severe Emotional Distress, Comment e, at 74 (1965) (listing police officers as an example of the type of individuals who in exercising their authority can become liable for extreme abuses of their positions).

Additionally, Plaintiff has presented sufficient evidence from which a jury could conclude that Defendants caused him severe emotional distress. As an initial matter, Plaintiff's severe distress during the incident itself is evident from the video. The sounds of Plaintiff screaming, sobbing, and exclaiming "I want to go home!" and "Am I going to die here?" after he was tased are difficult to listen to and will likely be compelling to a jury. Pl. APFOF ¶ 76–77. Moreover, since the episode Plaintiff has suffered nightmares and repeated, frequent panic attacks for which he was prescribed medication and which are often triggered by exposure to law enforcement. Pl. APFOF ¶¶ 138–39. Plaintiff also sought mental health treatment for his trauma related to this incident and his therapist concluded that he suffers from symptoms of what might be Post-Traumatic Stress Disorder. Pl. APFOF ¶ 140. The fact that Plaintiff's emotional distress manifested itself through physical symptoms that necessitated medical treatment is more than sufficient to characterize the emotional distress as severe. *See, e.g., Honaker v. Smith*, 256 F.3d 477, 495 (7th Cir. 2001) (interpreting equivalent Illinois state tort noting that Illinois courts have been more inclined to characterize the emotional distress as severe when the distress has manifested itself either through physical symptoms or has necessitated medical treatment even

though neither physical injury nor the need for medical treatment is a necessary prerequisite to establishing severe emotional distress).

**VI.     Defendants are not entitled to discretionary immunity on Plaintiff's state-law claims**

Defendants contend that they are immune from liability under Wis. Stat. § 893.80(4) in connection with Plaintiff's state law claims of malicious prosecution and intentional infliction of emotional distress. Dkt. 31 at 22–24. Immunity for discretionary acts does not apply to conduct that is "malicious, willful, or intentional." *Willow Creek Ranch, LLC v. Town of Shelby*, 611 N.W.2d 693, 700 (Wis. 2000). "Malice in the legal sense connotes 'the intent, without justification or excuse, to commit a wrongful act.'" *Burnley v. Village of Brown Deer*, 2020 WL 620014, at *8 (E.D. Wis. 2020) (quoting Black's Law Dictionary (11th ed. 2019). "Reckless disregard of the law or of a person's legal rights can also constitute malice." *Id.*

Since a reasonable jury could find that each Defendant's conduct was, at the very least, "in reckless disregard of the law," *see id.*, discretionary immunity is unavailable as to Plaintiff's malicious prosecution and intentional infliction of emotional distress claims. *See, e.g., id.* at (denying discretionary act immunity where a reasonable jury could find that police officer's excessive force was done with reckless disregard of the plaintiff's rights); *Coleman v. Moldenhauer*, 2015 WL 6680225, at *10 (E.D. Wis. Nov. 2, 2015) (denying discretionary act immunity where there "is evidence in the record that the defendants used enough force to cause Coleman to suffer physical injury. Thus, taking the facts in the light most favorable to Coleman, the Court cannot conclude as a matter of law that the defendants conduct was not malicious, willful and intentional, or that a reasonable jury could not find that they committed a battery."); *Brown*, 288 F. Supp. 2d at 984.

**VII.    There is no basis to dismiss Plaintiff's claims for punitive damages**

Without citing a single case in support of their position, Defendants assert that Plaintiff's punitive damages claim should be dismissed because he "cannot show" that any of the defendants were motivated by evil motive or intent or that they acted with reckless or callous indifference to his federally protected rights. Dkt. 31 at 17. This argument fails because, as discussed above, when the facts and reasonable inferences are construed in the light most favorable to Plaintiff, a reasonable jury *could* conclude that each Defendant acted with reckless or callous indifference—Defendant Gaard by tasing Plaintiff when he was not actively resisting arrest; Defendants Gaard and Taylor by pointing their guns at Plaintiff without justification; and all three Defendants by causing Plaintiff to be prosecuted for resisting/obstructing in order to cover up their misconduct. *See, e.g., G.J. v. Wood Cnty.*, 2021 WL 2593458, at *10 (W.D. Wis. June 23, 2021) (denying summary judgment on punitive damages claim in excessive force case where a jury could conclude that the defendant acted with reckless or callous indifference); *Meddaugh v. Matthews*, 2024 WL 3823095, at *10 (W.D. Wis. Aug. 14, 2024) (denying summary judgment on punitive damages claim where "[c]onsidering the disputed facts in a light most favorable to the plaintiff, as nonmovant, a reasonable jury could conclude that Deputy Matthews acted with reckless indifference to his rights under the Fourth Amendment to be free from the excessive use of force."); *Lux v. City of Whitewater*, 2022 WL 4536935, at *10 (E.D. Wis. Sep. 28, 2022) ("The court agrees with the defendants that Johnson's tone at the scene was reasonable and friendly. But it will not, at this stage, prohibit the plaintiffs from seeking punitive damages. If a jury concludes that Johnson was aware that Vander Steeg or Zens were using excessive force but did not intervene, his friendly tone may not preclude the jury from also concluding that he acted with callous indifference."); *Carter v. City of Wauwatosa*, 2022 WL

3228046, at *16 (E.D. Wis. Aug. 10, 2022) (denying summary judgment as to punitive damages claim based on factual disputes); *Cunningham v. City of Chi.*, 2020 WL 1503580, at *7 (N.D. Ill. Mar. 30, 2020) (same).

## VIII.   There is no basis to dismiss Plaintiff's indemnification claim

Finally, Defendants assert that Plaintiff's indemnification claim should be dismissed because it is premature and because the claims against the individual Defendants should be dismissed. Dkt. 31 at 24–25. Defendants' argument that the indemnification claim is premature is contrary to established law in the Seventh Circuit and should be rejected. *See Wilson v. City of Chicago*, 120 F.3d 681, 685–87 (7th Cir. 1997) (rejecting the position that a claim for indemnification is premature until a judgment is entered); *Washington v. Richmond*, 2024 WL 4973392, at *2 (E.D. Wis. Dec. 4, 2024) (holding that the plaintiff's indemnification claim against Kenosha County under Wis. Stat. § 895.46 was not premature, citing *Wilson*). Because Plaintiff's claims against the individual Defendants should not be dismissed, neither should his indemnification claim.

**CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' motion for summary judgment.

Dated: December 5, 2025                           Respectfully submitted,

                                                  /s/ Nora Snyder
                                                  Nora Snyder, Ben H. Elson,
                                                  Brad Thomson
                                                  PEOPLE'S LAW OFFICE
                                                  1180 N. Milwaukee Ave.
                                                  Chicago, IL 60642

773-235-0070
[norasnyder@peopleslawoffice.com](mailto:norasnyder@peopleslawoffice.com)
[ben@peopleslawoffice.com](mailto:ben@peopleslawoffice.com)
[brad@peopleslawoffice.com](mailto:brad@peopleslawoffice.com)

***Attorneys for Plaintiff Ian Cuypers***