IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

IAN RICHARD CUYPERS,

                              Plaintiff,                          OPINION and ORDER

        v.
                                                                 24-cv-743-jdp
JUSTIN TAYLOR, TAYLOR GAARD,
MATTHEW BROWN, and CITY OF SUPERIOR,
                              Defendants.

City of Superior police officers stopped plaintiff Ian Cuypers after he drove the wrong way down a one-way street. Guns drawn, the officers ordered Cuypers to get out of his vehicle, to step backward, to face away from them, to keep his hands on his head, and to kneel. When Cuypers did not immediately obey this last instruction, Officer Taylor Gaard tased him. Cuypers was subsequently charged with resisting or obstructing an officer. He was acquitted after a jury trial.

Cuypers asserts claims for excessive force, malicious prosecution, and intentional infliction of emotional distress against three of the officers who were on the scene during this incident. Both sides move for summary judgment. Cuypers asks for partial summary judgment that Gaard used excessive force when she tased him. Dkt. 38. Defendants ask for summary judgment on all claims. Dkt. 30.

The court will grant Cuypers's motion and deny defendants' motion. Video footage and the undisputed facts show that Cuypers immediately pulled over, got out of the car when ordered to do so, kept his hands above his head, and substantially complied with defendants' instructions. Yet from the beginning, defendants treated the situation like a high-risk event, escalating what should have been a simple traffic stop into a volatile encounter that ended with

a significant use of force. No reasonable jury could find that the use of a taser was reasonable here, and if a jury credited Cuypers's view of the facts, it could find for him on his other claims as well.

## UNDISPUTED FACTS

The court draws the following facts from the officers' dash and body camera footage and from the parties' proposed findings of fact. These facts are undisputed.

On the evening of February 28, 2024, Ian Cuypers was driving in Superior, Wisconsin, delivering orders for DoorDash. Superior police officer Justin Taylor observed Cuypers turn and begin driving the wrong way down a one-way street. Taylor activated his lights and Cuypers pulled over. From inside his police vehicle, Taylor observed Cuypers reaching across to the passenger's side of his car and rummaging around. (Cuypers was searching for his insurance paperwork inside his glove compartment.) Taylor called for backup, saying on his radio, "there's a lot of furtive movements, I'll take a second."[1] Dkt. 32-3 (Taylor dash cam 1:19–1:23). Taylor got out of his police vehicle but did not approach Cuypers. From his vantage point behind Cuypers's vehicle, Taylor observed Cuypers "looking down a lot and looking around." Dkt. 42 (Taylor Dep. 119:21–120:3).

Less than two minutes later, defendant officers Taylor Gaard and Matthew Brown and non-defendant officers Jason Moen and Dylan Crist arrived on the scene. Taylor told the other officers that Cuypers had been "digging around a lot in the passenger's side, in the center

---

[1] Taylor testified that in the police department, a request for a "second" means a request for an additional officer to respond to the scene. Dkt. 42 (Taylor Dep. 111:8–21).

console, and everywhere else." Dkt. 32-4 (Taylor body cam 2:13– 2:18). Taylor and Gaard drew their guns and pointed them at Cuypers's vehicle.

Brown yelled for Cuypers to put his hands where they could see them and Cuypers stuck his hands out the driver-side window. Taylor told Cuypers to open the door with his left hand, which Cuypers did. Taylor directed Cuypers to step out of the vehicle with his hands up, facing away from the officers. Cuypers got out of the vehicle and turned towards the officers with his hands raised in a questioning gesture. He asked, "what's happening?" Taylor told him again to face away, and Cuypers did. Dkt. 32-3 (Taylor dash cam 3:05–3:15). On Taylor's instruction, Cuypers placed his hands behind his head and interlaced his fingers. He then turned his head toward the officers again, yelling something that is not audible on the body or dash cam footage. He turned back around when the officers told him to do so.

Taylor admonished Cuypers for "not listening" and told him to move slowly backwards. Cuypers did so, saying, "I feel like I'm being assaulted." At one point, he removed his hands from his head and threw a bandana that he was wearing on his head to the ground, but he kept his hands visible in the air while he did so. Brown told Cuypers, "Don't do anything other than keep your hands on top of your head." Cuypers asked if there were guns on him and said, "I really do not feel like I am being treated well." He asked multiple times for an explanation of what was going on, but the officers didn't answer him.

What happened next occurred over the course of approximately 15 seconds. Dkt. 32-3 (Taylor dash cam 4:15–4:30). Brown directed Cuypers twice to get down on his left knee, while Cuypers, with his hands still up, asked the officers what he had done. Gaard said, "do it now or you're going to get tased!" Brown told Cuypers a third time to get down on his left knee and

immediately after, Gaard deployed her taser, striking Cuypers in the back and legs. Cuypers screamed and collapsed to the ground.

Officers moved in and handcuffed Cuypers. Gaard told Cuypers not to move, or he would be tased again. Cuypers cried and said, "I'm going to die here, aren't I? Am I going to die?" Dkt. 40-8 (Gaard body cam 2:50–2:54). After about a minute, Cuypers told the officers that he couldn't feel his legs and allowed officers to lift him into a standing position. The officers placed Cuypers against a police vehicle so that Gaard could remove the taser prongs from his body. Gaard told Cuypers that he was in this position because he wasn't following the officers' commands. Dkt. 40-8 (Gaard body cam 5:50–6:00).

The officers arrested Cuypers, and Taylor issued him two citations for violating civil ordinances: one for driving the wrong way down a one-way street and one for resisting or obstructing an officer. In July 2024, Cuypers was acquitted of the obstruction charge after a jury trial.

ANALYSIS

Cuypers's claims fall into three categories. First, he asserts federal claims under 42 U.S.C. § 1983, contending that each of the officer defendants used excessive force against him in violation of his Fourth Amendment rights or failed to intervene to prevent the other officers from using excessive force. Second, he asserts state-law claims for malicious prosecution and intentional infliction of emotional distress against each of the officer defendants. Third, he asserts a state-law indemnification claim against the City of Superior.

On a motion for summary judgment, the question is whether there are any genuine factual disputes that could make a difference to the outcome of the case; or in other words,

whether a reasonable jury could find for the nonmoving party, after drawing all reasonable inferences in that party's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 314–15 (7th Cir. 2011); *Montgomery v. American Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010). But in "rare circumstances when video footage clearly contradicts the nonmovant's claims, [courts] may consider that video footage without favoring the nonmovant." *Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018) (citing *Scott v. Harris*, 550 U.S. 372, 378–81 (2007)).

## A.  Federal use of force claims

The basic question for an excessive force claim under the Fourth Amendment is whether the officer used "greater force than was reasonably necessary." *Snukis v. Taylor*, 145 F.4th 734, 741 (7th Cir. 2025). Courts assess the amount of force used from the perspective of a reasonable officer in light of the totality of the circumstances known to the officer, without regard to the officer's actual intent or his subjective beliefs. *Williams v. Indiana State Police Dep't*, 797 F.3d 468, 472–73 (7th Cir. 2015). In assessing reasonableness, relevant factors include the seriousness and immediacy of any threat posed by the plaintiff, the severity of any suspected crime, and the extent of the plaintiff's resistance or interference with an officer's duties. *Dawson v. Brown*, 803 F.3d 829, 833 (7th Cir. 2015). When all material facts are undisputed, "reasonableness is a pure question of law" for the court. *Siler v. City of Kenosha*, 957 F.3d 751, 759 (7th Cir. 2020).

Qualified immunity shields government officials who make good-faith mistakes in the performance of their duties. Qualified immunity protects government officials from individual liability under 42 U.S.C. § 1983 unless the unlawfulness of the official's conduct was clearly established at the time of the violation. *Bradley v. Vill. Of Univ. Park, Illinois*, 59 F.4th 887, 904

(7th Cir. 2023) (citing *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018)). For the unlawfulness of a defendant's conduct to be clearly established, a reasonable officer in the defendant's shoes would need to understand that he was violating the plaintiff's right. *Doxtator v. O'Brien*, 39 F.4th 852, 863 (7th Cir. 2022). The use of excessive force is an area of the law "in which the result depends very much on the facts of each case," so police officers are entitled to qualified immunity unless existing precedent "squarely governs" the specific facts at issue. *Kisela v. Hughes*, 584 U.S. 100, 104 (2018). "This sounds like a high bar because it is—qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Doxtator*, 39 F.4th at 863 (citation and quotation marks omitted).

Cuypers contends that Taylor and Gaard used excessive force when they pointed their guns at him and that Gaard used excessive force when she tased him. He also contends that each of the defendants failed to intervene to prevent the others from using excessive force. Defendants contend that the force used on Cuypers was reasonable under the circumstances and that, even if it was not, they are entitled to qualified immunity. They also contend that the failure-to-intervene claims fail because the defendants lacked a reasonable opportunity to intervene, and that Cuypers's request for punitive damages fails as a matter of law.

### 1. Gaard's use of a taser

Both defendants and Cuypers have moved for summary judgment on the issue whether Gaard used excessive force when she deployed her taser to Cuyper's back and legs. Deploying a taser is a significant use of force because it inflicts intense pain and temporary paralysis on its victim. *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 726 (7th Cir. 2013). In the Seventh Circuit, an officer's use of a taser is objectively reasonable, or at least does not violate clearly established law, if a suspect is actively resisting arrest. *Dockery v. Blackburn*, 911 F.3d 458, 467

(7th Cir. 2018). Active resistance can include physically lashing out at officers or "declining to follow instructions while acting in a belligerent manner." *Id.* (citing *Forrest v. Prine*, 620 F.3d 739, 745–46 (7th Cir. 2010)). Using a taser can also be reasonable if a suspect poses a threat to the officers or others on the scene. *Bell v. Irwin*, 321 F.3d 637 (7th Cir. 2003) (suspect was armed with knives, threatened suicide, and made a move toward a nearby propane tank); *Shirley v. Rabensteine*, No. 22-2147, 2023 WL 129432 (7th Cir. Jan. 9, 2023) (suspect hid in an attic for hours, suddenly fell through the ceiling, and may have been armed). But the law is clearly established that officers may not use tasers merely to gain compliance from suspects accused of minor offenses who are not resisting arrest or are only passively resisting. *Dockery*, 911 F.3d at 467; *see also Abbott*, 705 F.3d at 732; *Cyrus v. Town of Mukwonago*, 624 F.3d 856 (7th Cir. 2010).

In light of these rules, the dispositive question in this case is whether a reasonable officer in Gaard's position would have believed that Cuypers was actively resisting or otherwise posed a threat. The court concludes that a reasonable officer could not have believed those things, nor could any reasonable jury find otherwise. This is not a close case. Video footage shows that Cuypers was not actively resisting arrest. He immediately pulled over when Taylor activated his lights. He followed officers' instructions to put his hands up and to get out his vehicle, and he kept his hands above his head at all times from when he exited his vehicle to when Gaard deployed her taser. He moved his hands slightly and turned his head toward the officers a few times, but he put his hands back on his head and turned away when officers reminded him to do so. Cuypers appeared frightened and confused, but he was not belligerent or resistant; on the contrary, Cuypers substantially complied with the officers' instructions throughout the encounter.

Nor could any reasonable officer have believed that Cuypers posed a threat in the moment immediately before Gaard deployed her taser. A screenshot of that moment is shown below from two vantage points: Taylor's dash cam and Brown's body cam.





The images show that when Gaard deployed her taser, Cuypers was facing away from the officers, with his hands hovering near his head. He had not yet obeyed Brown's instruction to get down on his left knee, but he was not reaching for a weapon, and his body position gave no indication that he was planning to imminently flee or attack the officers. He was no longer standing near his vehicle, and Taylor, Gaard, and Brown all had weapons out and ready, so any

threat that Cuypers may theoretically have posed when he was in his vehicle was neutralized. "This was simply not the kind of 'tense, uncertain, and rapidly evolving' situation that required 'split-second' judgment calls." *See Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 526 (7th Cir. 2012) (quoting *Graham v. Connor,* 490 U.S. 386, 397 (1989)). The circumstances don't support any significant use of force against Cuypers in this moment.

Defendants argue that a reasonable officer would have perceived Cuypers as a threat for the following reasons:

- He made "furtive movements" in his vehicle.

- He "refused multiple, loud, clear commands."

- He "was moving toward officers after failing to keep his hands on his head and face away from officers."

- He was "exhibiting target glancing behaviors consistent with imminent assault or flight."

Dkt. 31, at 10. None of these reasons makes the use of significant force reasonable. Taylor testified that he believed the "furtive movements" may have been Cuypers reaching for a weapon or attempting to conceal contraband. Dkt. 42 (Taylor Dep. 99:3–9). But even if Cuypers had retrieved a weapon, he would have had no reasonable opportunity to use it when Gaard deployed her taser, because at that point he was standing several feet from the officers, facing away, with his hands in the air. Defendants' assertion that Cuypers moved toward the officers is directly contradicted by the video evidence, which shows that Cuypers moved backwards toward the officers only when Taylor directly instructed him to do so. *See Scott v. Harris*, 550 U.S. 372, 381 (2007) (instructing lower courts not to consider testimony that "is so utterly discredited by the record that no reasonable jury could have believed [it]"). And as

for Cuypers's alleged non-compliance, circuit precedent is clear that officers cannot use significant force solely to gain compliance, if the non-compliance does not pose a risk to officers or others at the scene. *Phillips*, 678 F.3d at 524–25; *Cyrus*, 624 F.3d at 863. No reasonable officer could interpret Cuypers's failure to keep his hands on his head and to stay facing away from the officers as posing a risk. Cuypers's hands were visible in the air the entire time; his feet remained facing away from the officers; and he turned back around each time the officers reminded him to do so.

That leaves defendants' argument that Cuypers engaged in "target glancing behaviors consistent with imminent assault or flight." Dkt. 31, at 10. In her deposition, Gaard testified that "target glancing" means that a suspect repeatedly glances in the direction of law enforcement officers, possibly to gauge their position in anticipation of fleeing or attacking. Dkt. 36 (Gaard Dep. 76:12–23). But Gaard was unable to identify any characteristic that distinguishes "target glancing" from simply looking at law enforcement officers, nor did she identify anything about the specific way that Cuypers was looking at them that suggested he was planning to flee or attack. *See id.* (Gaard Dep. 79:22–89:24). Defendants' "target glancing" argument amounts to an assertion that officers can use significant force anytime a suspect looks at them, which is plainly inconsistent with circuit precedent.

Defendants cite *Clarett v. Roberts*, 657 F.3d 664 (7th Cir. 2011), and *United States v. Norris*, 640 F.3d 295 (7th Cir. 2011), but those cases are readily distinguishable. In *Clarett*, an offer tased a suspect who was blocking them from entering her son's bedroom, where the officer could hear a "commotion" between the son and the officer's colleagues. 657 F.3d at 675. The court held that the use of a taser was reasonable because the suspect was preventing the officer from assisting their colleagues, who the officer  reasonably believed needed help. *Id.* In *Norris*,

officers tased a suspect who ignored commands to stop and show his hands. 640 F.3d at 303. The court held that the officers reasonably believed that the suspect might have been reaching for a weapon, because his hands were near his waistband and out of view. *Id.* The common thread in both *Clarett* and *Norris* is that officers reasonably perceived the suspect as a threat to themselves or others on the scene. Here, Cuypers had his hands up and had substantially complied with officers' commands to get out of his vehicle, to turn away from them, and to back up. No reasonable officer could have perceived him as a threat to anyone's safety at the time that he was tased.

The law is clear that it is unreasonable to deploy a taser against a non-violent suspect who is not actively resisting or otherwise posing a threat. The video evidence leaves no doubt that Cuypers was not actively resisting and did not pose a threat to the officers or anyone else on the scene. Gaard's use of a taser was objectively unreasonable and violated clearly established law, so the court will grant Cuypers's motion for partial summary judgment and deny defendants' motion on the excessive force claim based on Gaard's use of a taser.

### 2. Taylor's and Gaard's pointing their gun at Cuypers

Defendants move for summary judgment on Cuypers's excessive force claims based on Taylor and Gaard's pointing their guns at him. Pointing a gun at someone is a use of force, which is evaluated for objective reasonableness like any other kind of force. *Baird v. Renbarger*, 576 F.3d 340, 344 (7th Cir. 2009); *Jacobs v. City of Chicago*, 215 F.3d 758, 774 (7th Cir. 2000); *McDonald by McDonald v. Haskins*, 966 F.2d 292, 292–93 (7th Cir. 1992). The court of appeals has held that it is not objectively unreasonable for an officer to point a gun at an individual who presents a credible threat. *Baird*, 576 F.3d at 346. But "gun pointing when an individual

presents no danger is unreasonable and violates the Fourth Amendment." *Id.* at 345 (citing *Jacobs* and *McDonald*).

Cuypers contends that under clearly established law, he did not present a credible threat that would have justified Taylor and Gaard pointing their guns at him. Cuypers relies on *Jacobs* and *Baird*, which he says stand for the proposition that officers may not point guns at compliant individuals who are suspected of only minor, non-violent offenses. In *Jacobs*, officers pointed a gun at the plaintiff for more than ten minutes while they searched his apartment, even though they knew that he was not the person they were looking for and he was entirely compliant with officers' directions. The court held that it was unreasonable for the officers to point a gun at the plaintiff "when they allegedly had no reason to suspect that he was a dangerous criminal, or indeed that he had committed any crime at all, [he] was unarmed, and when [he] had done nothing either to attempt to evade the officers or to interfere with the execution of their duties." 215 F.3d at 774. In *Baird*, an officer detained multiple people at an auto body shop and a nearby warehouse at gunpoint and held them for nearly two hours while he investigated the possible alteration of a vehicle identification number. The court held that the officer violated the detainees' clearly established rights, because "there was no suggestion of danger, either from the alleged crime that was being investigated or the people he was targeting." 576 F.3d at 346.

Defendants don't dispute the general rule that it is unreasonable for officers to point guns at individuals who don't present a danger. But they say that Taylor and Gaard reasonably believed that Cuypers did present a danger, because (1) he made "furtive" movements in his vehicle and (2) he failed to comply with officers' commands. A reasonable jury could find that neither of these things presented a threat of any kind. In his deposition, Taylor could not

12

identify anything that distinguished the "furtive" movements Cuypers made from the movements someone would make when attempting to get their insurance paperwork from their glove box. Dkt. 42 (Taylor Dep. 97:19–101:2). Nor did the description of Cuypers's movements that Taylor gave Gaard when she arrived at the scene suggest that he was doing anything other than looking for his insurance paperwork. Dkt. 32-4 (Taylor body cam 2:13– 2:18) (Taylor explaining to Gaard and the other officers that Cuypers was "digging around a lot in the passenger's side, in the center console, and everywhere else"). The court has already explained that Cuypers's alleged "non-compliance" amounted to at most minor deviations from the officers' instructions. In short, a reasonable jury could find that Taylor and Gaard pointed their guns at a compliant individual who presented no threat of danger and had done nothing other than turn the wrong way down a one-way street. That would be objectively unreasonable and would violate clearly established law under *Baird* and *Jacobs*, so Taylor and Gaard are not entitled to summary judgment on the gun pointing claims on either reasonableness or qualified immunity grounds.

### 3. Failure to intervene

Cuypers also asserts excessive force claims against Gaard, Taylor, and Brown on a failure-to-intervene theory. Cuypers says that Gaard failed to intervene to prevent Taylor from pointing his firearm at Cuypers, and that Taylor and Brown failed to intervene to stop Gaard from using her taser. A defendant may be held liable for failing to stop another officer's use of excessive force if the defendant had reason to know that the other officer was violating the plaintiff's constitutional rights, and the defendant had a "realistic opportunity" to prevent the violation. *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005). "A realistic opportunity means a chance to warn the officer using excessive force to stop." *Miller v. Gonzalez*, 761 F.3d 822,

826 (7th Cir. 2014) (internal quotation marks omitted). It is generally for the jury to determine whether the plaintiff has proven the elements for a failure to intervene. *Abdullahi v. City of Madison*, 423 F.3d 763, 773–74 (7th Cir. 2005).

The court will allow Cuypers's failure-to-intervene claims to proceed to trial. This court has held in multiple other cases that even a few seconds of warning is enough to raise a fact question about whether another officer could have intervened. *See Harris v. City of La Crosse*, 745 F. Supp. 3d 733, 754 (W.D. Wis. 2024); *Stabenow v. City of Eau Claire*, 546 F. Supp. 3d 787, 799 (W.D. Wis. 2021) (collecting cases). The video footage shows that Gaard had ample opportunity to warn Taylor to put his gun down because he had his gun trained on Cuypers for more than a minute. Dkt 40-7 (Taylor body cam 2:31–3:53). Gaard was standing behind Taylor for at least some of this time; the parties don't explain whether she could see him pointing his gun and that will be up to the jury to decide. As for the use of the taser, the video footage shows that approximately two seconds before she deployed her taser, Gaard warned Cuypers that he would be tased if he didn't comply. Dkt. 32-3 (Taylor dash cam 4:23–4:28). The laser sights from Gaard's taser were also visible on Cuypers's back for several seconds before Gaard deployed the taser. *Id.* A reasonable jury could decide from those facts that Taylor and Brown had at least a few seconds to tell Gaard not to use the taser.

### 4. Punitive damages

Punitive damages are available in § 1983 cases upon showing of "evil motive or intent, or . . . reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). Defendants contend that Cuypers cannot meet this standard for any of his § 1983 claims.

The court concludes that a reasonable jury could find that defendants acted with callous indifference to Cuypers's rights. The court has already concluded that a reasonable jury could disbelieve that Cuypers was acting in a non-compliant or threatening manner; if so, it could also find that it was reckless or callous indifference for defendants to point their guns at him and to tase him. The video footage also shows that the defendants shouted at Cuypers for not following instructions and at one point, Gaard told Cuypers that he was he was in this position because he wasn't following their commands. Dkt. 40-8 (Gaard body cam 5:50–6:00). A reasonable jury could infer that the defendants allowed Cuypers to be tased simply to punish him for not listening to them.

## B.  State-law claims

Cuypers asserts state-law claims against each of the defendant officers for malicious prosecution based on their citing him for resisting or obstructing an officer, and for intentional infliction of emotional distress based on their behavior during and after the traffic stop. As an initial matter, defendants contend that they are immune from suit under Wis. Stat. § 893.80(4), which confers immunity on government officers and employees for discretionary acts performed in the scope of their official duties. *Sheridan v. City of Janesville*, 164 Wis. 2d 420, 425, 474 N.W.2d 799 (Ct. App. 1991). But defendants acknowledge that governmental immunity does not apply to acts that are "malicious, willful, and intentional." *Est. of Perry v. Wenzel*, 872 F.3d 439, 462 (7th Cir. 2017) (citing *Bicknese v. Sutula*, 260 Wis. 2d 713, 660 N.W.2d 289, 296 (2003)). Malicious prosecution and intentional infliction of emotional distress are intentional torts, so malice or intent is one of the elements that Cuypers will have to prove to prevail on those claims. *Turner v. Sanoski*, 2010 WI App 92, ¶¶ 12–13; 327 Wis. 2d 503, 787 N.W.2d 429; *Rabideau v. City of Racine*, 2001 WI 57, ¶¶ 34–36, 243 Wis. 2d 486,

627 N.W.2d 795. Defendants cite no authority for the view that governmental immunity applies to shield a government officer or employee from liability for an intentional tort.

### 1. Malicious prosecution

A state-law malicious prosecution claim has six elements:

1. Judicial proceedings were started or continued against the plaintiff.

2. The proceedings were put in motion by or at the instance of the defendant.

3. The proceedings were terminated in the plaintiff's favor.

4. There was malice in instituting the proceedings.

5. There was no probable cause for instituting the proceedings.

6. The plaintiff suffered damages.

*Elmer v. Chicago & N.W. Ry. Co.*, 257 Wis. 228, 231, 43 N.W.2d 244 (1950). There is no dispute as to the first, third, and sixth elements. Cuypers was cited for resisting or obstructing an officer in violation of City of Superior Ordinance § 102-1. A jury acquitted him of that charge in July 2024. And Cuypers testified that he experienced emotional distress from this incident, for which he sought medical care. Defendants contend that summary judgment is warranted because Cuypers cannot establish the other three elements. Defendants say that they had probable cause that Cuypers had obstructed officers, that Cuypers lacks evidence of malice, and that for defendants Gaard and Brown, Cuypers lacks evidence that they were involved in the citation.

Probable cause is the amount of evidence that would lead a reasonable police officer to believe that the individual probably committed a crime. *State v. Weber,* 2016 WI 96, ¶ 20, 372 Wis. 2d 202, 887 N.W.2d 554; *Heilgeist v. Chasser*, 98 Wis. 2d 97, 295 N.W.2d 26 (Ct. App. 1980). Probable cause is a mixed question of fact and law. If the facts are in dispute, then the

jury determines the facts, and the court determines whether those facts amount to probable cause. If the facts are undisputed, then probable cause is a pure question of law. *Elmer*, 257 Wis. at 232.

The ordinance Cuypers was cited under prohibits individuals from "commit[ting] an act in violation of Wis. Stats. §§ 946.40 and 946.41." City of Superior Ordinance § 102-1. Defendants assert that Cuypers violated § 946.41, which makes it unlawful to "knowingly resist[] or obstruct[] an officer while such officer is doing any act in an official capacity and with lawful authority." Wis. Stat. § 946.41(1). Defendants say that Cuypers obstructed them because he failed to comply with orders to keep his hands on his head, to face away, and to kneel. Cuypers argues that any non-compliance on his part was too minor to be obstruction, because it didn't impede the officers' ability to perform their duties.

The court agrees with Cuypers. Under Wisconsin law, an individual "obstructs" an officer if his conduct prevents or makes it more difficult for an officer to perform his duties. Wis. JI-Criminal 1766. "The action justifying an arrest for obstruction cannot simply 'inconvenience' the official; the action must make a difference in an official's ability to perform an official act." *Henes v. Morrissey*, 533 N.W.2d 802, 808 (Wis. 1995); *see also McGowan v. City of Milwaukee*, No. 19-cv-0781-bhl, 2022 WL 3354746, at *9–*10 (E.D. Wis. Aug. 12, 2022) (arresting plaintiffs for refusing to disperse from a protest scene would be justified only if the refusal inhibited officers' ability to maintain order). *Henes* implies that an officer does not have probable cause to arrest someone for failing to comply with an order unless the officer reasonably believes that the non-compliance was impeding his ability to maintain safety or perform other law enforcement duties.

Defendants point out that in previous cases, both this court and the Eastern District of Wisconsin have held that failure to comply with lawful orders provides probable cause for a § 946.41 violation. *Stahenow*, 546 F. Supp. 3d at 800–01; *Prip v. Erwin*, No. 14-cv-552-wmc, 2015 WL 4394526 (W.D. Wis. July 16, 2015); *United States v. Bogan*, No. 17-cr-128, 2017 WL 9485688 (E.D. Wis. Sept. 26, 2017).[2] But those cases did not explicitly grapple with the issue presented here; on the contrary, it was at least implicit in each case that the suspect's non-compliance had interfered with the officers' ability to maintain safety or complete law enforcement duties. *See Stahenow*, 546 F. Supp. 3d at 800 (suspect ignored commands to keep his hands out of his pockets after admitting he had a knife); *Prip*, 2015 WL 4394526, at *5 (suspect may have been attempting to interfere with officers' arrest of another protester); *Bogan*, 2017 WL 9485688, at *1 (suspect refused to get out of vehicle after officers noticed he was holding a handgun). *Stahenow*, *Prip*, and *Bogan* do not support defendants' position that any non-compliance, regardless of how harmless, amounts to obstruction under Wis. Stat. § 946.41.

That leaves the question whether Cuypers's non-compliance did in fact impede the officers from performing their duties. Cuypers has admitted that he moved his hands slightly when officers had told him to interlace his fingers behind his head, that he occasionally turned his head toward officers when they had told him to face away, and that he did not immediately

---

[2] Defendants also cite *Pullen v. House*, 88 F. Supp. 3d 927 (W.D. Wis. 2015) and *Harris v. City of La Crosse*, 745 F. Supp. 3d 733 (W.D. Wis. 2024), but those cases aren't instructive either. In *Pullen*, the court concluded that officers may have lacked lawful authority to give commands, so it did not reach the issue whether the plaintiff's non-compliance amounted to obstruction. 88 F. Supp. at 939–40. In *Harris*, the court explicitly declined to decide whether disobeying orders amounts to obstruction under § 946.41; instead, it resolved the probable cause issue on qualified immunity grounds. 745 F. Supp. at 751.

kneel down when officers ordered him to do so. In his response brief, Cuypers argues that these acts of non-compliance were so minor that they could not possibly have impeded the officers' ability to conduct a safe traffic stop. Cuypers says that he never did anything to prevent defendants from placing handcuffs on him, and that the defendants did not need him to interlace his fingers behind his head or to kneel in order to handcuff him. Dkt. 47, at 35. Defendants did not contest this point in their reply brief, so they have forfeited any argument to the contrary. The court concludes that Cuypers's non-compliance did not impede the officers from performing their duties, so there was no probable cause to cite him for violating § 946.41.

As for malice, the court concludes that Cuypers has adduced evidence sufficient for a reasonable jury to find in his favor. For the purpose of a malicious prosecution claim, malice means that the defendants acted either with "ill will or vindictiveness toward the plaintiff" or that they acted "for an improper motive or purpose," meaning for a reason "other than the social one of bringing an offender to justice." *Meyer v. Ewald*, 66 Wis. 2d 168, 174–75, 224 N.W.2d 419 (1974). As evidence of malice, Cuypers points to body cam footage of a conversation between Brown and Taylor shortly after the incident. Brown told Taylor that it might be better to charge Cuypers with an ordinance violation compared with a criminal charge, because "everything was justified there [during the traffic stop]," but "how he [Cuypers] interprets the world might be a little different than how we do." Dkt. 40-7 (Taylor body cam 23:45–24:25). Taylor responded that he thought that if force was used, then he had to charge Cuypers with a crime. *Id.* (Taylor body cam 24:43–24:50). A reasonable jury could infer from this conversation that Brown and Taylor did not actually believe that Cuypers's behavior was obstruction, but wanted to prosecute him to justify their use of force. As for Gaard, a reasonable jury could find that her description of Cuypers's non-compliance in her use of force report does

not match the video footage. Dkt. 40-10 (describing Cuypers as beginning to "turn his body toward us" at the moment force was used).  That could also support a reasonable inference that Gaard wanted to prosecute Cuypers for improper reasons.

That leaves the personal involvement element. A person is liable for malicious prosecution only if the judicial proceedings are initiated "by, or at the instance" of that individual. *Elmer*, 257 Wis. at 231. Taylor was undisputedly involved in initiating Cuypers's citation, because he was the officer who signed the citation. Defendants argue that Gaard and Brown weren't involved, but Cuypers has adduced evidence that Taylor consulted with Gaard and Brown about what charges to bring against Cuypers and that he took their advice. That's enough to create a triable issue on Gaard and Brown's involvement in initiating the charges.

### 2.  Intentional infliction of emotional distress

Cuypers's intentional infliction of emotional distress claim is based on the same conduct as his excessive force and malicious prosecution claims, specifically, defendants' pointing their guns at him, tasing him, and citing him for obstruction. To establish a claim for intentional infliction of emotional distress, Cuypers must demonstrate that (1) the conduct was extreme and outrageous; (2) defendants intended to cause emotional distress; and (3) defendants' conduct did in fact cause extreme and disabling emotional distress. Wis. JI-Civil 2725; *see also Przybyla v. Przybyla*, 87 Wis. 2d 441, 444, 275 N.W.2d 112 (1978).

Defendants don't engage with the elements of this claim separately from their arguments about Cuypers's Fourth Amendment claims. They simply rehash their arguments that defendants' behavior was a legitimate law enforcement response, which the court has already rejected. Defendants' arguments on this claim are undeveloped, so they are forfeited

for the purpose of summary judgment. *See Irish v. BNSF Ry. Co.*, 674 F.3d 710, 714–16 (7th Cir. 2012).

## C. Indemnification

Defendants contend that Cuypers's indemnification claim under Wis. Stat. § 895.46 is premature because no judgment has yet been entered against the individual defendants. But this court has held that "it is appropriate and efficient to keep the county as a defendant in the case for the purpose of ordering complete relief." *Murphy v. Juneau Cnty.*, No. 22-cv-33-jdp, 2023 WL 3040649, at *7 (W.D. Wis. Apr. 21, 2023) (collecting cases); *see also Lewis v. Columbia Cnty.*, No. 23-CV-77-jdp, 2024 WL 1833817 (W.D. Wis. Apr. 26, 2024); *Hardick v. Cripe*, No. 23-cv-550-jdp, 2025 WL 71853 (W.D. Wis. Jan. 10, 2025) (explaining that the court will keep the municipality in the case, but not identify it as a defendant at trial). The court will take the same approach here and deny the motion for summary judgment for the City of Superior.

ORDER

IT IS ORDERED that:

1. Plaintiff's motion for partial summary judgment, Dkt. 38, is GRANTED as for plaintiff's Fourth Amendment excessive force claim against defendant Gaard for deploying her taser on Cuypers's lower back and legs.

2. Defendants' motion for summary judgment, Dkt. 30, is DENIED. The case will proceed to trial on the following claims and issues:

   a. Defendants Taylor and Brown failed to intervene to prevent Gaard from deploying her taser.

   b. Defendants Taylor and Gaard used excessive force against Cuypers in pointing his firearm at him.

    c.    Defendant Gaard failed to intervene to prevent Taylor from pointing his firearm.

    d.    Defendants Gaard, Taylor, and Brown violated Wisconsin law by initiating a malicious prosecution against him for obstructing officers.

    e.    Defendants Gaard, Taylor, and Brown violated Wisconsin law by intentionally inflicting emotional distress on Cuypers.

    f.    Compensatory and punitive damages for all claims.

    g.    Indemnification against the City of Superior.

Entered February 9, 2026.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge